Bonnie Gail WEIRICH, Individually and as Managing Conservator for Charles Jacob Weirich and Jennifer Gail Weirich, Petitioner,

v.

Opal WEIRICH, Respondent.

No. D–0477.

Supreme Court of Texas.

June 24, 1992.

Rehearing Overruled Sept. 9, 1992.

John F. Nichols, Lynn S. Kuriger, Larry J. Doherty, Houston, for petitioner.

Douglass D. Hearne, Don W. Kothmann, Austin, for respondent.

## OPINION

GONZALEZ, Justice.

This is a child abduction case. Based on favorable jury findings, the trial court rendered judgment for the plaintiff. The court of appeals reversed and rendered a take nothing judgment. 796 S.W.2d 513. Among other things, we must decide whether the record contains some evidence that the respondent, Opal Weirich, violated the Texas Family Code's child custody provisions. We hold that there is some evidence that she did. We thus reverse the judgment of the court of appeals and remand to that court for a review of the

statutory violations in accord with this opinion.

In February 1982, Ralph Noel Weirich (Noel) abducted his two children from their mother, Bonnie Weirich. Noel's mother, Opal Weirich, allegedly assisted in the abduction. Bonnie sued her husband, Noel, and her mother-in-law, Opal, for the intentional and negligent infliction of emotional distress, for the intentional and negligent interference with child custody, and for violations of the Family Code's child custody provisions. The jury returned a verdict against Noel on all questions, but found Opal liable only on the negligence and Family Code questions. Based on the jury's verdict, the trial court granted Bonnie a $5,947,684.89 judgment jointly and severally against Noel and Opal. Both Noel and Opal appealed.

The court of appeals dismissed Noel's appeal for want of prosecution, reversed the trial court's judgment for Opal, and rendered a take nothing judgment. The court held that no direct actions existed for the negligent interference with a family relationship or the negligent infliction of emotional distress, and determined that no evidence *and* insufficient evidence supported the Family Code claims. Because we dispose of this case on statutory grounds, we express no opinion on the correctness of the court of appeals' writing on negligent infliction of emotional distress; and we conclude that there is more than a scintilla of evidence indicating that Opal aided and assisted Noel's violation of the Family Code's child custody provisions. A fuller recitation of the facts is necessary in order to put the issues before us in proper context.

On February 1, 1982, Bonnie Weirich petitioned for divorce from Noel Weirich and simultaneously obtained a temporary restraining order preventing Noel from interfering with Bonnie's possession of their two children, ages six and seven at that time. On February 4, Noel abducted the children from their school in San Antonio and took them to Johnson City, where the three of them stayed with Opal on the Weirich farm.[1] Upon learning of the abduction, Bonnie telephoned Opal, told her of the pending divorce, and asked her to call if she discovered the children's whereabouts, which Opal agreed to do. But Opal did not call despite the fact that the children and Noel stayed with Opal between February 4–8, during which Opal purchased new sets of clothing for the children.[2]

On February 8, a private investigator confronted Noel at Houston's Hobby Airport, recovered the two children, and served Noel with the February 1 temporary restraining order. The children were returned to Bonnie later that day. The next day, the trial court extended the order restraining Noel from interfering with Bonnie's custodial rights. The court extended that order again on February 19. In the interim, the trial court held a hearing on February 12 during which it appointed Bonnie as temporary managing conservator and further enjoined Noel from interfering with Bonnie's right to possess the children.

On February 23, Noel borrowed $4000 from a Johnson City bank on a note cosigned by Opal as guarantor. Noel identified his home address on the note as the Weirich farm in Johnson City. Soon thereafter, Opal loaned Noel her truck, which was used to remove furniture, files, and every item relating to the children from

1. Noel had abducted the children once before. After Bonnie had filed for divorce in 1976, Noel took the children at gunpoint from Bonnie and went to stay with Opal. Bonnie called Opal looking for the children, but Opal denied that they were with her. After Bonnie agreed to dismiss the divorce proceeding, she and Noel drove to the Weirich farm and retrieved the children.

2. On March 11, 1982, a hearing was held on a motion for contempt filed by Bonnie against

Noel and others alleged to have aided in Noel's February 25 abduction of the children. At this hearing, Opal testified that she did not buy the children clothing during February 1982. Subsequent discovery of Opal's financial records revealed that she purchased clothing for the children on February 6 and 7. At the hearing's conclusion, the court found Noel in contempt and set punishment at six months in the county jail.

Bonnie's house in San Antonio. The removed material was stored in a barn on the Weirich farm.[3]

On February 25, 1982, Noel *again* abducted the children from their school and took them to Johnson City. Opal then drove Noel and the children to the airport. That evening, Bonnie called Opal to inquire as to the children's whereabouts. Opal said that Noel had taken them camping for a couple of weeks, but she did not know where. In fact, Noel had taken the children to Mexico. Bonnie did not see her children again for over seven years.

On March 3, 1982, Bonnie had Opal served with a petition alleging the following three causes of action against Opal and Noel: 1) common law interference with child custody; 2) intentional infliction of emotional distress; and 3) negligent infliction of emotional distress.[4] And on March 5, the Bexar County District Attorney notified Opal's attorney that Noel had been indicted for child abduction. Additionally, on March 11, Opal was present at a contempt hearing wherein it was alleged that Noel had violated a court order regarding custody. Opal was informed by the trial judge that he expected the custody order to be obeyed. The trial court with jurisdiction over Bonnie's divorce proceedings subsequently granted Bonnie a divorce on April 28, 1982, appointed her as permanent managing conservator, and appointed Noel as possessory conservator without visitation rights.

On November 28, 1988, seven days prior to trial, Bonnie amended her petition alleging a cause of action for interference with child custody in violation Chapter 36 of the Family Code. The Family Code sections relevant to this case are found in TEX.FAM. CODE §§ 36.02 & 36.07 and read as follows:

> § 36.02 Liability for Interference with Child Custody

(a) A person who takes or retains possession of a child or who conceals the whereabouts of a child in violation of a court order that provides for possessory interests in a child may be liable for damages to the person who is denied a possessory interest in the child.

\*    \*    \*    \*    \*    \*

(c) Each person who aids or assists in conduct for which a cause of action is authorized by Subsection (a) of this section is jointly and severally liable for damages.

(d) A person who was not a party to the suit in which a court order was issued providing for possessory interests in a child is not liable under this chapter for a violation of the court order unless the person at the time of the violation:

> (1) had actual notice of the existence and contents of the order; or

> (2) had reasonable cause to believe that the child was the subject of a court order and that his actions were likely to violate the order.

§ 36.07 Notice

(a) As a prerequisite to the filing of suit under this chapter, a person who has been denied a possessory interest in a child in violation of a court order shall give written notice to the person violating the order.

\*    \*    \*    \*    \*    \*

(d) Notice need not be given to persons aiding or assisting in conduct for which a cause of action is authorized under this section.

■ The jury charge, which was constructed from Bonnie's statutory allegations, combined the causes of action defined in § 36.02(a) and § 36.02(c). That is, it gave the jury the option of finding Opal liable for directly interfering with Bonnie's custodial rights by either taking, retaining, or concealing the children (in violation of a court order), or for aiding and assisting

---

3. Opal testified in her deposition that Noel told her, when he borrowed the truck, that he and Bonnie "had furniture to split" and that he wanted to "put some of it down at the barn." At trial, Opal said she knew nothing about the furniture stored in the barn.

4. Bonnie only pleaded common law causes of action because the Texas Family Code's provisions on the liability for interference with child custody did not become effective until September 1, 1983.

Noel in doing the same. The court of appeals correctly concluded that in order to hold Opal directly liable under § 36.02(a), Bonnie had to have given her the notice required by § 36.07(a). 796 S.W.2d at 520. Bonnie wrongly asserts that she did not have to give such notice since she filed suit prior to September 1, 1983, the effective date of Chapter 36. But Bonnie was bound by the notice requirement, because she did not plead the statutory claims until she filed her Third Amended Petition on November 28, 1988, which was over five years after Chapter 36 became law. Thus, Bonnie should have given Opal the statutorily required notice of her intent to file a claim under § 36.02(a).[5]

We turn now to the § 36.02(c) cause of action under which Bonnie alleged that Opal was liable for aiding and assisting Noel in the taking, retaining, or concealing of the children. If Opal aided and assisted Noel, then Bonnie did not have to give Opal notice before filing suit against her, because the Family Code provides that **"[n]otice need not be given to persons aiding and assisting"** another's violation of the Code's child custody provisions. *See* TEX. FAM.CODE §§ 36.07(d) and 36.07(c). So Opal may be liable if she aided and assisted Noel in either taking, retaining, or concealing the children as long as she had reasonable cause to believe (or actual notice) that a court order affecting custodial rights existed. Because of the discussion that follows, we conclude that there is some evidence that Opal aided and assisted Noel's violation of the Family Code's child custody provisions, and some evidence that she had reasonable cause to believe an order existed at least after March 11, 1982.[6]

■ In reviewing the substance of Bonnie's § 36.02(c) cause of action, the court of appeals held that no evidence and insufficient evidence supported the jury's finding that Opal aided and assisted Noel. 796 S.W.2d at 518. In reviewing no evidence

points, we must view the evidence in the record in a light which tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary. *See Pool v. Ford Motor Co.,* 715 S.W.2d 629, 634–35 (Tex.1986). Thus, we must examine the record to see whether some evidence exists to support the fact in issue, namely, whether Opal aided or assisted Noel in interfering with Bonnie's custodial rights.

■ The court of appeals incorrectly concluded that no evidence supported Opal's alleged violation of the Family Code's child custody provisions. A number of orders were issued affecting Bonnie's custodial rights, the most significant of which the trial court rendered in open court during the March 11 contempt hearing, stating that anyone who knew Noel should "advise him that court orders are signed by a district judge to be adhered to." Two other items of evidence go to the issue of Opal's notice. First, on March 5 she received notice from the Bexar County District Attorney that Noel had been indicted for child abduction. And second, during the March 11 contempt hearing, Opal stated under oath that if she ever discovered the whereabouts of Noel and the children, she would "notify this court and the plaintiff's lawyers." By swearing in open court, Opal assumed an affirmative duty to notify Bonnie's attorneys or the court if she discovered the whereabouts of the children. She discovered their whereabouts no later than 21 months after making that statement, when the children and Noel visited her at her farm during Christmas 1983.

The court of appeals erred in concluding that no evidence existed that Opal aided and assisted Noel's violation of the Family Code. 796 S.W.2d at 518. The record contains some evidence supporting the fact that Opal did aid and assist Noel by concealing the whereabouts of the children

---

5. Before trial, Opal specially excepted to the lack of notice under § 36.02(a) and moved for an abatement so that proper notice could be given. The trial court overruled the special exceptions and denied the abatement and Opal's motion for continuance.

6. This is the date Opal was in court for a contempt hearing wherein it was alleged that Noel had violated a child custody order.

after Noel had abducted them. That evidence includes the following: 1) Noel's February 27 telephone call to Opal from Mazatlan, Mexico, informing Opal of his and the children's whereabouts; 2) Christmas 1983 and Thanksgiving 1985 visits by Noel and the children to Opal's Johnson City farm; 3) at least two other visits to Opal from Noel and the children; and finally, and perhaps most important, 4) the telephone records discovered after the trial which revealed a series of phone calls between Johnson City and Malibu, California, where Noel had settled with the children. Taken together, this amounts to some evidence that Opal aided and assisted Noel's violation of the Family Code's child custody provisions; that is, Opal wrongfully concealed the children's whereabouts, when as a party, she was charged with notice of all orders in the case. *See, e.g., Fears v. Mechanical & Indus. Technicians*, 654 S.W.2d 524, 528 (Tex.App.—Tyler 1983, writ ref'd n.r.e.); *Mayad v. Rizk*, 554 S.W.2d 835, 838–39 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.); *Pentikis v. Texas Elec. Service Co.*, 470 S.W.2d 387, 389 (Tex.Civ.App.—Fort Worth 1971, writ ref'd n.r.e.).

## SUMMARY

In summary, we hold that the court of appeals applied the wrong notice standard in determining whether Opal had notice of the temporary restraining order; and that some evidence exists to support the fact that Opal Weirich aided and assisted Noel Weirich's violation of the Texas Family Code's child custody provisions. Because we dispose of this cause exclusively under the Family Code, we do not reach and express no opinion on the correctness of the court of appeals' writing on negligent infliction of emotional distress and negligent interference with a family relationship. We thus reverse the judgment of the court of appeals and remand this cause to that court to review the sufficiency of the evidence points of error on the Family Code violations in accordance with this opinion.

MAUZY and DOGGETT, JJ., concur with separate opinions.

MAUZY, Justice, concurring.

Three and a half years ago, a Texas jury found that Opal Weirich had been a co-conspirator in the abduction of Bonnie Weirich's children. Since that time, Bonnie Weirich has had to fight a seemingly endless battle to obtain any relief for the tragic loss she has suffered.

Because Opal Weirich presented sufficiency of the evidence points of error in the court of appeals, I reluctantly concur in the court's decision to remand the cause to that court. I hope, though, that this long struggle for justice will soon come to an end. Given the overwhelming evidence presented, there is no reason why justice should be delayed any further.

DOGGETT, Justice, concurring.

I dreamed [that] I was walking down a suburban street seeing other people's children and I stopped to see one in a carriage and I thought it was a sweet child, but I was looking for *my* child in his face. And I realized, in the dream, that I would do that forever. And I went on walking heavy and sad and woke heavy and sad.[1]

Bonnie Weirich has suffered perhaps the greatest injury a mother can experience: the loss of her children. Her ex-husband abducted her two young children not twice but three times—first at gunpoint, then by subterfuge, and finally in violation of a temporary restraining order—each time with the apparent assistance of Opal Weirich. The final abduction lasted for over *seven years*, but in fact, Bonnie may have lost her children forever—by the time they were located they had grown distant from her, and no longer knew the stranger who was their mother.

---

1. Diary entry of Anne Morrow Lindbergh, who lost her child in one of the most famous kidnappings in American history. Anne Morrow Lindbergh, *Hour of Gold, Hour of Lead: Diaries and Letters of Anne Morrow Lindbergh 1929–1932* 252 (1973).

The majority today correctly concludes that the court of appeals erred in reversing the judgment of the trial court under the Family Code. So as not to disregard this woman's suffering, however, I would have also addressed Bonnie's common law causes of action. For Bonnie, there appears to be little hope; her children are gone, this ten year-old case is remanded to the court of appeals solely for consideration of whether sufficient evidence exists of a statutory violation, and the likelihood of returning to this court is apparent. So that the court of appeals will not be misguided in its review by the majority's silence, I write separately.

## I.

The applicable sections of chapter thirty-six of the Family Code allow for recovery from a person who either "retains possession of a child or who conceals the whereabouts of a child in violation of a court order," or who "aids or assists" in such conduct. Tex.Fam.Code § 36.02(a), (c). Opal was served on March 3, 1982 with the charges against her for interference with child custody and infliction of emotional distress. She was made aware of her son's indictment for child abduction on March 5, and more significantly, she was present at the March 11 hearing, at which a contempt order against her son was announced and a writ of attachment issued for the children. In issuing these orders, the court stated:

[I]f there is anybody in this courtroom who loves this man [Opal's son] and has feelings for him, like his sister and *his mother* and I assume his brother, I would strongly suggest that you advise him that court orders are signed by district judges to be adhered to.[2]

Examples of Opal's aiding and assisting are set out by the majority, but there is additional suggestive evidence. During the second abduction, in the first weeks of February, 1982 Opal's son and children apparently stayed in a trailer home on her property. Prior to the third kidnapping, Opal loaned her son money, enabling him to flee the country with the children. She provided her truck to remove household belongings which were then stored in her barn. On February 25, he used her car to get the children from school, after which she drove all of them to the airport for a flight to Mazatlan, Mexico. That same day, Opal told Bonnie that the children had gone camping, and at the March 11 hearing she professed unawareness by testifying that she would "notify th[e] court" *if* she learned of the children's whereabouts. As noted by the majority, however, only two days after the abduction, Opal's son had called her from Mazatlan, confirming the children's location. Despite all of this, she continued not to advise the court of her son's visits and communications. Any reasonable reading of this record, particularly when viewed in the light most favorable to the findings of fact, inescapably supports the jury's finding that Opal assisted her son in concealing the whereabouts of Bonnie's children, despite actual or constructive knowledge of a court order.

## II.

By resolving this cause entirely on statutory grounds, the majority "express[es] no opinion on the correctness of the court of appeals' writing on negligent infliction of emotional distress and negligent interference with a family relationship." At 946. This reluctance to reach Bonnie's common law causes of actions should in no way be

---

2. When Opal became a party to the suit, the notice requirement of chapter thirty-six, applicable only to third parties, became irrelevant. *See* Tex.Fam.Code § 36.07(d). For the period before she was named, the statute provides that "[n]otice need not be given to persons aiding or assisting in conduct for which a cause of action is authorized under this section." *Id.* There is some confusion in the Code because section 36.07(d) does *not* exempt actions for actual concealment from the notice requirement, while section 36.02(d) purports to exempt all actions under that chapter where a third party "had reasonable cause to believe that the child was the subject of a court order and that his actions were likely to violate the order." We need not attempt to resolve this apparent conflict today because Opal was actually made party to the suit, and as even Opal's counsel conceded at oral argument, by 1983, Opal had actual notice of a court order.

read as commenting on the ability of victims of interference with child custody to bring both statutory and common law causes of action. Since the statute explicitly provides that it "does not affect any other civil or criminal remedy available to any person ... for interference with child custody," Tex.Fam.Code § 36.06, the court of appeals appropriately noted this enactment was not in "derogation of other available common law remedies." 796 S.W.2d 513, 515 n. 3. *See also Smith v. Smith,* 720 S.W.2d 586, 600 (Tex.App.—Houston [1st Dist.] 1986, no writ); Ellen K. Solender, *Family Law: Parent and Child,* 38 Sw.L.J. 173, 174 (1984) ("[c]ontinued expansion of the common law is permissible since the statute specifically does not preempt the possibility of other remedies").

Because other causes of action may be brought in conjunction with the statutory action for interference with child custody, Bonnie properly pursued her common law claims. If on remand the court of appeals should somehow find factually insufficient evidence of a statutory violation, Bonnie is still free to appeal again to this court her negligence claims. Such delay, however, is unwarranted. As this court previously declared, "[d]irecting a mother who has been deprived of her child for ... years 'to go and start over' is unconscionable, and compounds the error of the lower courts." *Lewelling v. Lewelling,* 796 S.W.2d 164, 168 n. 9 (Tex.1990) (citations omitted).

Regarding the cause of action for negligent interference with the family relationship, the court of appeals perceptively concluded that *Sanchez v. Schindler,* 651 S.W.2d 249 (Tex.1983), did not create such a cause of action, but rather dealt with a damages issue. This court has neither expressly acknowledged nor rejected an independent action for negligent interference with family relationship. We have recognized, however, that negligence can cause

recoverable damages in a setting involving the family relationship. *See, e.g., Whittlesey v. Miller,* 572 S.W.2d 665, 668 (Tex. 1978) ("either spouse has a cause of action for loss of consortium that might arise as a result of an injury caused to the other spouse by a third party tortfeasor's negligence"); *Sanchez,* 651 S.W.2d at 252 (a "claim for damages for the loss of companionship of a child is closely analogous to the loss of consortium cause of action created in *Whittlesey* "); *Salinas v. Fort Worth Cab & Baggage Co.,* 725 S.W.2d 701, 703 (Tex.1987) (some evidence that negligent hiring caused impairment of the family relationship where a passenger was raped in front of her children by a taxi driver).

To the extent that the fifteen year old provision of the Restatement of Torts on which the court of appeals relies can be read as recognizing only an action for intentional interference with the family relationship, 796 S.W.2d at 515–16 (citing Restatement (Second) of Torts § 700 (1977)), this does not comport with Texas' allowance of mental distress damages in negligence actions.[3] Furthermore, there seems to be some conflict in the Restatement itself, for while the wording of the relevant section uses language of intent, its commentary seems to be consistent with the general rule in Texas that serious injuries resulting from any conduct interfering with the family relationship should be compensated: "[t]he deprivation to the parent of the society of the child is itself an injury that the law redresses." Restatement (Second) of Torts § 700, comment d (1977).[4]

Similarly, the court of appeals concluded that there is no Texas authority recognizing "an independent cause of action for negligent infliction of emotional distress in the context of a child abduction case." 796 S.W.2d at 516. In fact, even the Fifth Circuit has recognized that mental suffer-

---

**3.** This difference between the rule in Texas and that of the Restatement has been recognized in *Fenslage v. Dawkins,* 629 F.2d 1107, 1110 (5th Cir.1980).

**4.** The recent trend towards recognizing causes of action for interference with the family relationship was referenced to the legislature in its

deliberations regarding chapter thirty-six in the testimony of University of Texas School of Law Professor Jack Sampson. Debate on Tex. H.B. 544, 68th Leg., R.S. (March 23, 1983) (recording available from the Texas House of Representatives).

ing damages are recoverable under Texas law in child abduction cases. *See Fenslage v. Dawkins*, 629 F.2d 1107, 1110 (5th Cir. 1980).

The court of appeals is hasty in its conclusion that this court has never explicitly created a cause of action for negligent infliction of emotional distress. In *St. Elizabeth Hosp. v. Garrard*, 730 S.W.2d 649 (Tex.1987), we repeatedly referenced the "tort of negligent infliction of mental anguish," *id.* at 651–52, 654, though admitting that the "[d]evelopment and administration of [this] tort have been inconsistent and confusing." *Id.* at 651. We therefore looked to guidance from other jurisdictions, and in large part followed the lead of California, whose experience on this particular subject remains informative.

In 1968, the California Supreme Court recognized that a bystander who observed an injury to a closely related third person could state a cause of action for negligent infliction of emotional distress despite the absence of any physical manifestation of injury. *Dillon v. Legg*, 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912 (1968). Twelve years later, *Molien v. Kaiser Found. Hosps.*, 27 Cal.3d 916, 167 Cal.Rptr. 831, 616 P.2d 813 (1980), allowed such a recovery in a non-bystander case. In 1989, in another bystander case, the court focused on establishing a duty of care as a necessary element of recovery in a negligence action. *Thing v. La Chusa*, 48 Cal.3d 644, 257 Cal.Rptr. 865, 869–70, 771 P.2d 814, 818–19 (1989). The court criticized, but did not overrule *Molien* for implying that negligent infliction of emotional distress was a separate cause of action. *Id.* 257 Cal.Rptr. at 874, 771 P.2d at 823. Additionally, it suggested that, excepting bystander cases, emotional distress damages may be recoverable in a negligence action only where the party seeking recovery is the "direct victim" of that negligence. *Id.* 257 Cal. Rptr. at 866, 771 P.2d at 815. That same year, the court decided that negligent infliction of emotional distress is encompassed by the general tort of negligence, with the traditional elements of duty and causation, rather than existing as an independent cause of action. *Marlene F. v. Affiliated Psychiatric Medical Clinic*, 48 Cal.3d 583, 257 Cal.Rptr. 98, 102, 770 P.2d 278 (1989). Thus, since *Molien*'s inception, California has apparently moved toward concluding that there is no *cause of action* for negligent infliction of emotional distress, but rather that emotional distress is an element of *damages* in a traditional negligence action. *See generally* B.E. Witkin, 6 *Summary of California Law* §§ 838–57 at 194–220 (9th ed. 1988 & Supp. 1991).[5] Like any other negligence action, damages need not necessarily be accompanied by a physical injury, although the California courts limit the recovery of solely emotional damages to cases where the nonphysical injury is severe. *See Marlene F.*, 257 Cal.Rptr. at 102, 770 P.2d at 281–82. Our court has agreed that a physical manifestation requirement is an "arbitrary restriction[ ] on recovery." *St. Elizabeth Hospital*, 730 S.W.2d at 654.[6]

---

**5.** North Carolina has also recently concluded that "an allegation of ordinary negligence will suffice" so long as the pleadings also "allege that severe emotional distress was the foreseeable and proximate result of such negligence." *Johnson v. Ruark Obstetrics & Gynecology Assocs.*, 327 N.C. 283, 395 S.E.2d 85, 97 (1990).

**6.** Numerous other states have abandoned the outdated physical impact or manifestation requirement. *See, e.g., Johnson*, 395 S.E.2d at 95; *Ayers v. Township of Jackson*, 106 N.J. 557, 525 A.2d 287 (1987); *Farmers & Merchants Bank v. Hancock*, 506 So.2d 305 (Ala.1987); *Gates v. Richardson*, 719 P.2d 193 (Wyo.1986); *James v. Lieb*, 221 Neb. 47, 375 N.W.2d 109 (1985); *Morris v. Hartford Courant Co.*, 200 Conn. 676, 513 A.2d 66 (1986); *Johnson v. Supersave Markets, Inc.*, 211 Mont. 465, 686 P.2d 209 (1984); *Bass v.*

*Nooney*, 646 S.W.2d 765 (Mo.1983) (en banc); *Paugh v. Hanks*, 6 Ohio St.3d 72, 451 N.E.2d 759 (1983); *Culbert v. Sampson's Supermarkets, Inc.*, 444 A.2d 433 (Me.1982); *Barnhill v. Davis*, 300 N.W.2d 104 (Iowa 1981); *Sinn v. Burd*, 486 Pa. 146, 404 A.2d 672 (1979); *Hunsley v. Giard*, 87 Wash.2d 424, 553 P.2d 1096 (1976); *Whetham v. Bismarck Hosp.*, 197 N.W.2d 678 (N.D.1972); *Leong v. Takasaki*, 55 Hawaii 398, 520 P.2d 758 (1974); *Battalla v. State*, 10 N.Y.2d 237, 219 N.Y.S.2d 34, 176 N.E.2d 729 (1961). Even the United States Supreme Court has recognized that "the majority of jurisdictions now appear to have abandoned" the rule that "a plaintiff could not recover for mental injuries unconnected with actual or threatened impact." *Atchison, Topeka and Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 569–70 n. 20, 107 S.Ct. 1410, 1418 n. 20, 94 L.Ed.2d 563 (1987).

Ordinarily, this court, like California, recognizes mental harm as an element of damages, and not of a cause of action.[7] Our writing in *St. Elizabeth Hospital* appears to have confused the two, just as the California court did in *Molien.*

If Texas does recognize a separate tort of negligent infliction of emotional distress, a question not answered today, then the court of appeals erred. If there is no separate tort, and rather, like California, emotional distress is solely a question of damages, then Bonnie need only have plead and shown negligence to justify her recovery for the severe mental suffering she has experienced. Her pleadings are sufficient to support such a cause, since they allege "negligence" in the interference with the family and "negligence" in inflicting emotional harm. Certainly all of the traditional negligence elements are present[8]: Opal owed Bonnie the duty not to assist in the children's kidnapping, a legal duty on which chapter thirty-six of the Family Code is based, as well as a duty arising from her testimony to the court that she would notify the court of the children's location.[9] Bonnie pled and proved to the satisfaction of the jury that this duty was breached, with resulting emotional trauma foreseeable to any reasonable person.[10] I am aware of no reason why the jury finding that Opal was "negligent" should not result in liability for the severe harm proximately caused.[11]

### III.

In light of the foregoing, I concur with the majority that there was some evidence of a statutory violation in this instance. Because there was also an insufficiency point raised, the cause must be remanded for further consideration by the court of appeals.[12] The wheels of justice have turned slowly for Bonnie, whose children were stolen from her ten years ago. By failing to address the issues above, today's opinions have only ensured a continued slow grind through the system.

---

7. See, e.g., *Sanchez,* 651 S.W.2d 249 (damages for loss of companionship of a child in a wrongful death suit); *Luna v. North Star Dodge Sales, Inc.,* 667 S.W.2d 115 (Tex.1984) (mental anguish damages recoverable in DTPA action); *Billings v. Atkinson,* 489 S.W.2d 858, 861 (Tex.1973) (mental anguish is recoverable as an element of damages for invasion of privacy). See also *Federal Land Bank Assn' of Tyler v. Sloane,* 825 S.W.2d 439, 443 (Tex.1991) (considering mental anguish arising from a negligent misrepresentation claim purely as a matter of damages, and concluding that pecuniary loss is required "in what is essentially a commercial tort").

8. Bonnie's briefs to this court specifically maintain the presence of all such elements.

9. Duty also arose from Opal's voluntarily entering into an "affirmative course of action affecting the interests of another." *Otis Eng'g Corp. v. Clark,* 668 S.W.2d 307, 309 (Tex.1983).

10. As expressed by counsel for Bonnie at oral argument, "one would certainly foresee that if you kidnap a woman's children, both the mother and the child will suffer mental anguish."

11. Although pleading "negligent infliction of emotional distress" rather than "negligence," the mother of a sexually abused child was held thereby to have stated a proper claim for negligence in *Marlene F.,* 257 Cal.Rptr. at 102–03, 770 P.2d at 282.

12. Hopefully the majority's overly narrow view of this cause will in no way constrict the court of appeals from doing its job in "assist[ing] this court in meeting its responsibilities." *Winters v. Houston Chronicle Publishing Co.,* 795 S.W.2d 723, 733 (Tex.1990) (Doggett, J., concurring).