CENTURY MARINE, INC., Sipco Services & Marine, Inc., and Roy R. Brock, Appellants,

v.

Charles Glen VAGLICA, Appellee.

No. 09–98–044 CV.

Court of Appeals of Texas, Beaumont.

Submitted Oct. 14, 1999.

Decided Oct. 5, 2000.

Rehearing Overruled Nov. 16, 2000.

Robert M. Roach, Jr., Robert Dubose, Cook & Roach, L.L.P., Houston, for appellants.

C. Scott Mann, Jr., Zona Jones, Bernsen, Jamail & Goodson, L.L.P., Beaumont, for appellee.

Before WALKER, C.J., BURGESS and HILL,* JJ.

## OPINION

WALKER, Chief Justice.

Century Marine, Inc., Sipco Services & Marine, Inc., and Roy R. Brock appeal from a judgment rendered in favor of Charles Glen Vaglica following a jury trial on Vaglica's allegations of breach of contract and fraud. Appellants present nine points of error. For reasons stated in this opinion all nine points are overruled and the judgment of the trial court is affirmed.

## ANTICIPATORY REPUDIATION

■ In their first point of error, appellants contend the trial court erred in entering judgment on Vaglica's anticipatory repudiation claim since there is no evidence, or alternatively, factually insufficient evidence, that the condition precedent to the memorandum of agreement had been met. When evaluating the legal sufficiency of the evidence, we consider only the evidence and inferences that tend to support the jury's finding, and disregard all evidence and inferences to the contrary. *See Weirich v. Weirich*, 833 S.W.2d 942, 945 (Tex.1992). If there exists any evidence to support the finding, the point will be overruled and the finding upheld. *See Southern States Transp., Inc. v. State*, 774 S.W.2d 639, 640 (Tex.1989). When reviewing a jury verdict to determine the factual sufficiency of the evidence, we must consider and weigh all the evidence and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

Factually, Century Marine and Sipco were subsidiaries of BET, Inc. and were primarily involved with ship repair and ship coating, respectively. While Charles Vaglica was employed by Century Marine, he entered into a memorandum of agreement with Century Marine and Sipco. The agreement, dated September 17, 1992, provided, among other things, that Century Marine would stop accepting new bids; that Vaglica, Century Marine, and Sipco would complete repair contracts on two ships, the MT. WASHINGTON and the CAPE ISABEL; that Vaglica's employment was to terminate upon completion of the items in the agreement; that Vaglica would be entitled to a bonus of all of Century Marine's profit over $300,000 and under $645,000 from those two projects; and that Century Marine would sell the majority of its assets to Vaglica for $255,000 within 30 days of the completion of the two ship repair contracts and completion of portions of the agreement that were necessarily prerequisite to the sale, except that no sale was to occur should completion of the contracts fail to produce a net margin in excess of $300,000. The jury determined that Century Marine had repudiated its agreement with Vaglica with regard to the repair of the two vessels and the conveyance of the real property.

Vaglica testified that the profit on the CAPE ISABEL job was $175,000 to $200,000. While acknowledging that the government had terminated the MT. WASHINGTON job, Vaglica alleged that major equipment repairs, clean-up costs, improper invoices from Sipco and work on the defendant's personal property were all improperly charged to the MT. WASHINGTON project, thereby diminishing the job's profit to such an extent that Century Marine could not produce a net margin in excess of $300,000.

Some evidence was presented that the profit necessary for Vaglica to exercise his option to purchase Century Marine's assets depended on the resolution of Century Marine's claims against the government

---

* The Honorable John Hill, sitting by assignment pursuant to TEX.GOV'T CODE ANN. § 74.003(b) (Vernon 1998).

(MARAD) for completed and/or extraordinary work. Vaglica testified, however, that prior to a final determination having been made with respect to those claims, Roy Brock advised him that neither Century Marine nor Sipco was required to sell the assets to him. Vaglica insisted at the time of trial that to his knowledge the government claim had still not been decided, but Brock, Peter Twidal, and a Mr. Hearn (B.T.H. Holdings, Inc.) had purchased Century Marine and Sipco.

A careful reading of Defense Exhibit 27, the Final Job Cost Report for the MT. WASHINGTON, reflects a final *budgeted* total contract amount of $7,081,049 and a final *actual* total contract amount of $7,489,265. The defense exhibit suggests, and the jury could have concluded, that the actual loss for the MT. WASHINGTON job equaled $408,216—the difference between the actual total contract amount and the final budgeted amount. The Final Job Cost Report figures for contract modifications, adjustments, and adjusted total values are validated by Plaintiff's Exhibit 7, "Request for Equitable Adjustment and Conversion of a Termination for Default to a Termination for the Convenience of the Maritime Administration on Contract DTMA 93–92–C–200038" (the Claim), which was prepared by the appellants' claims specialist. When a $408,216 loss is viewed in conjunction with evidence presented by Vaglica and acknowledged in appellants' reply brief, it appears that a jury, utilizing appellants' own methodology for calculating Century Marine's net profit, could have found some evidence that Century Marine met the $300,000 threshold established in the memorandum of agreement. To wit:

| | |
|---|---:|
| MT. WASHINGTON loss | ($408,216.00) |
| CAPE ISABELL profit | $200,000.00 |
| Expensed machinery repairs (credit alleged by Vaglica) | $100,000.00 |
| Expensed equipment repairs (credit alleged by Vaglica) | $ 40,000.00 |
| Work for Brock, charged to Century (credit alleged by Vaglica) | $ 38,000.00 |
| Sipco clean-up costs (credit alleged by Vaglica) | $ 25,000.00 |
| Disputed Sipco invoices (credit alleged by Vaglica) | $394,000.00 |
| Recovery on Retainer (included in MT. WASHINGTON loss) | $ 0.00 |
| Recovery on Government Claim | $ 0.00 |
| **NET PROFIT:** | $388,784.00 |

Appellants' construction of Vaglica's testimony regarding the value of the MT. WASHINGTON job loss and their allegation that Vaglica double-counted the retainer recovery in his calculation of Century Marine's profit are not supported by the Final Job Cost Report and the Claim.

Therefore, there is some evidence from which the jury could find Vaglica met the condition precedent to the memorandum of agreement by earning $300,000 profit on the two ship repair jobs. *See Weirich,* 833 S.W.2d at 945. Furthermore, the jury's finding that Vaglica met the condition precedent is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain,* 709 S.W.2d at 176. Point of error one is overruled.

■ In point of error two, appellants argue the trial court erred in submitting special issue number 4, which instructed the jury to determine when Vaglica's net profit on the two jobs should be calculated. Appellants allege the memorandum of agreement was not ambiguous as to when the net profit condition precedent should be calculated and the improper jury issue on net profit probably caused an improper verdict. Special issue number 4 reads, in relevant part, as follows:

Did Century Marine, Inc. repudiate the agreement between Century Marine, Inc. and Charles Glen Vaglica dated September 17, 1992, with regard to the repair of the MT. WASHINGTON and CAPE ISABEL contracts and the conveyance of the real property . . .

. . . .

It is your duty to determine from the language of the 1992 Memorandum of Agreement:

Whether the net profit of Century Marine, Inc. on the MT. WASHINGTON and CAPE ISABEL contracts is to be determined at the time that the MT. WASHINGTON contract was terminated by the Maritime Administration or upon the resolution of Century Marine, Inc.'s claim against the Maritime Administration . . .

In support of their argument, appellants contend: (1) the net profit margin was to be calculated upon conclusion of work on the ship repair contracts, (2) Century Marine's ship repair work was completed upon termination of the MT. WASHINGTON contract, (3) the contract provided no sale would occur "[s]hould *completion* of the repair contracts on the MT. WASHINGTON and the CAPE ISABEL *fail to produce* a net margin in excess of $300,000," and (4) that any damages recovered by Century Marine in the federal lawsuit were not produced by completion of the repair contracts, but rather would have been the result of future litigation.

■■■ *Coker v. Coker,* 650 S.W.2d 391, 393–94 (Tex.1983), articulates guidelines for the interpretation of written instruments. The court, citing *R & P Enter. v. LaGuarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 518 (Tex.1980), observed "[w]hether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered," and noted:

If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law . . . A contract, however, is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning.

*Id.* (citations omitted). Finally, *Coker* reiterated the principle that "[c]ourts must favor an interpretation that affords some consequence to each part of the instrument so that none of the provisions will be rendered meaningless." *Id.* at 394.

When the memorandum of agreement is viewed as a whole, in light of the circumstances present when the agreement was made, we agree with appellants that the instrument is not ambiguous. Item No. 5 of the agreement provided, subject to the provisions of Item No. 8, that Vaglica would purchase all assets of Century Marine for the lump sum of $255,000 cash, and that the sale would be completed and closed within 30 days of completion of the two ship repair contracts and completion of portions of the agreement that were necessarily prerequisite to the sale. The agreement's Item No. 7 set forth the basis for calculating Vaglica's potential bonus and noted that no sale would occur if the repair jobs failed to produce a profit in excess of $300,000. Finally, Item No. 8 contemplated that payments to Vaglica resulting from the agreement were to be used to complete the purchase of the assets.

The agreement contemplated multiple actions: that Century Marine would perform two ship repair jobs, calculate the profit or loss and, if the jobs generated at least $300,000 profit then apply Vaglica's bonus to the purchase of Century Marine's assets. That the agreement concerned more than just the completion of the two ship repair contracts is supported by Item No. 5 providing: "the sale [would] be completed and closed within 30 days of completion of the repair contracts on the MT. WASHINGTON and the CAPE ISABEL *and* completion of portions of [the] agreement that [were] necessarily prerequisite to the sale." Several determinations were "necessarily prerequisite" to completion of the sale, *e.g.,* (1) a detailed accounting of the project's costs, (2) calculation of profit or loss, (3) calculation of Vaglica's bonus and, (4) if he met the profit threshold, the application of his bonus to the purchase of the assets. Only after completion of both

the repair contracts and the prerequisite events would the 30–day period for completion of the sale become operative. Since, as we noted in point of error one, Vaglica could have met the profit threshold absent any contribution from the government claim, appellants' contention that such an interpretation would render the term "completion" meaningless is without merit. To the contrary, our interpretation affords some consequence to each part of the instrument while rendering none of the provisions meaningless.

■■■ As we find no ambiguity, the submission of an instruction regarding the time for determination of the net profit constituted error. Nevertheless, it is only reversible error if it probably caused the rendition of an improper verdict. *See* TEX. R.APP.P. 44.1(a)(1). Since the jury could have determined Vaglica earned the $300,000 profit necessary to satisfy the condition precedent even without considering disputed claims, any error was harmless and did not probably cause the rendition of an improper judgment. Point of error two is overruled.

Appellants argue in their third point of error that the trial court erred in submitting an anticipatory breach issue and in failing to submit a breach of contract issue to the jury. Appellants insist: "Century's obligation to sell the property could only arise at the time the ship repair jobs were completed, not after the final determination of a separate lawsuit alleging the government's wrongful termination of the repair contract." Appellants' concern about the determination of the government claim is irrelevant since it is clear from our analysis of points of error one and two that an instruction for either anticipatory breach or breach of contract would generate the same result. The breach, anticipatory or otherwise, was the result of appellants' failure to perform a proper accounting of the project's profit

or loss. Since the alleged error did not cause the rendition of an improper judgment, point of error three is overruled.

## FRAUD

■■ Points of error four and five attack the sufficiency of the evidence to support an action for fraud. The elements of actionable fraud in Texas are: "(1) that a material representation was made; (2) that it was false; (3) that, when the speaker made it, he knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by the party; (5) that the party acted in reliance upon it; and (6) that he thereby suffered injury." *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983) (quoting *Wilson v. Jones*, 45 S.W.2d 572, 574 (Tex.Comm'n App.1932, holding approved)).

Appellants urge in point of error four that since there is no evidence of a breach of the agreement, there is no fraud as a matter of law.[1] Pursuant to our ruling in point of error one, affirming the trial court's judgment on Vaglica's anticipatory repudiation claim, point of error four is overruled.

■■■ In point of error five, appellants insist there was no evidence that Brock or Sipco lacked the intent to perform when they entered into the agreement. Citing *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex.1992), appellants argue, "[f]ailure to perform a future act is fraud only when there is no intent to perform the act at the time the representation is made." While we agree that a party's failure to perform a contract, standing alone, is no evidence of that party's intent not to perform at the time the contract was made, we find substantial support for the proposition that intent "may be inferred from the party's

---

1. Although appellants' fourth point of error also contends there is factually insufficient evidence of their failure to perform, they

make no argument for that contention. *See* TEX.R.APP.P. 38.1(h).

subsequent acts after the representation is made." *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 434 (Tex.1986) (citing *Chicago, T & M.C. Ry. Co. v. Titterington,* 84 Tex. 218, 223, 19 S.W. 472, 474 (1892)). *Spoljaric* continues, "[s]ince intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence." *Id.* at 435. The evidence presented at trial supports the jury's finding. Philip Abraira, a former chief financial officer at B.E.T. Claims Service, Inc. and supervisor of the Sipco/HAT profit center, testified regarding Brock's interest, prior to the agreement, in the purchase of Century Marine for himself. Abraira testified that Peter Twidal, as chief accountant for the Sipco Century Marine profit center, inexplicably lowered the profit forecast provided to potential buyers by over $1,000,000, thereby diminishing the company's apparent market value and discouraging third-party purchasers. When a potential third-party purchaser, NSSI, met with Sipco Century Marine management to evaluate the purchase, Abraira characterized Brock's and Twidal's conduct as uncooperative, and testified that Twidal was terminated as a result of his egregious conduct at the meeting.

Vaglica testified that Brock directed him to repair all of Century Marine's equipment and charge the costs to the MT. WASHINGTON job. Abraira noted that during the time he was in charge at Sipco, he observed excessive expensing of repairs to equipment which he thought should have been capitalized. Both witnesses testified that expensing the equipment repairs to a job would have reduced job profits while increasing the value of Century Marine's equipment. Vaglica argues that by reducing profits, Brock made the company less attractive to potential buyers and prejudiced his rights under the memorandum of agreement.

Vaglica testified that Brock instructed him to pay $1.8 million in invoices from Sipco even though Vaglica disputed the legitimacy of approximately $400,000 of that amount. Abraira testified that Twidal attempted to negotiate a lower purchase price for Century Marine and Sipco by showing the $1.8 million in invoices as a deduction on Century Marine's balance sheet without showing the corresponding revenue as an asset on the Sipco balance sheet. Abraira, who was qualified as an expert, testified that in his opinion the actions of Brock and Twidal had the net effect of discouraging third-party purchasers for Sipco and Century Marine and driving down the price at which Brock and Twidal were able to purchase the property.

Abraira testified that a successful claim would impact the profitability of the MT. WASHINGTON project. Nevertheless, prior to the resolution of the MARAD claim, Brock advised Vaglica by letter that he considered Century Marine to have no further obligation to sell Century Marine's assets to Vaglica nor to pursue the MT. WASHINGTON claim.

Abraira testified that Vaglica's contract, the memorandum of agreement, diminished the value of Century Marine but agreed that if the contract were terminated after the sale of the company, it would cause Century Marine's value to go up.

■ "Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony." *Spoljaric,* 708 S.W.2d at 434. In spite of appellants' arguments to the contrary, a jury weighed the testimony and found sufficient evidence of fraud. When we consider only the evidence and inferences that tend to support the jury's finding, disregarding all evidence and inferences to the contrary, the evidence supports the jury's finding. When we consider all of the evidence, we find the jury's verdict is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Weirich,* 833 S.W.2d at 945. *Cain,* 709 S.W.2d at 176. Point of error five is overruled.

## PUNITIVE DAMAGES

Appellants argue in point of error six that the trial court erred in awarding punitive damages solely because the trial court's fraud finding supporting punitive damages was in error. Pursuant to our holding in points of error four and five, point of error six is overruled.

## BREACH OF EMPLOYMENT AGREEMENT

■ Appellants insist in point of error seven that the trial court erred in entering judgment for Vaglica on his breach of employment agreement claim because the evidence conclusively established as a matter of law that the memorandum of agreement modified the notice terms of his employment agreement by providing that Vaglica's employment would terminate upon completion of the ship repair jobs. They assert that at the time Vaglica was terminated he was an employee at will. The agreement provides that Vaglica was to no longer have an employment agreement with the company upon completion "of all items of this agreement by both parties." This is not the same as termination upon completion of the ship repair jobs. At the time of Vaglica's termination, the parties had not completed all items of the agreement. Therefore, Vaglica was not an employee at will at that time. Inasmuch as Vaglica was not an employee at will at the time of the termination, the notice requirements of his employment agreement were still in effect. It is undisputed that appellants did not comply with those requirements with respect to Vaglica's termination. We overrule point of error seven.

■ In point of error eight, appellants argue the trial court erred in entering judgment for Vaglica on his breach of employment agreement claim because the evidence conclusively established he had committed embezzlement. The jury found that Century Marine failed to comply with Vaglica's employment contract when it terminated him. The jury was instructed that failure to comply was excused if Vag-

lica committed gross malfeasance or embezzlement. Vaglica testified that shortly after receiving a letter from Brock confirming his termination, he transferred the title of a pontoon boat, motor and trailer that was initially in the name of Century Marine and sold them to a third party. The letter from Twidal terminating Vaglica was introduced into evidence. While Twidal expressed concern about the disposition of the pontoon boat, he did not list embezzlement of the boat as one of the reasons for terminating Vaglica. Vaglica testified that the pontoon boat in question was expensed to a job and purchased to provide transportation for his crew to a work site. He said it suffered a great amount of wear and tear and that he spent a lot of his own time on the weekends repairing it. He indicated that although it was still in bad shape after his efforts, he sold it and kept the proceeds as payment for the time and labor and expenses he had invested in it. Appellants have not referred us to any testimony indicating they were of the opinion that his actions constituted embezzlement. We hold the evidence did not conclusively establish that Vaglica was guilty of embezzlement and had been terminated for that reason. We overrule point of error eight.

## CONSTRUCTIVE TRUST AND *LIS PENDENS*

■ Appellants insist in point of error nine that it was error for the trial court to impose a constructive trust on the proceeds of the sale of the property in question and to refuse to release the notice of *lis pendens* for the property. We first note that, with respect to the issue of the trial court's imposition of a constructive trust on the proceeds of the sale of the property, appellants have presented neither argument nor authority in support of their position. Consequently, nothing is presented for review with respect to that issue. *See* TEX.R.APP.P. 38.1(h); *Vickery v. Vickery,* 999 S.W.2d 342, 352 (Tex.1999). Vaglica at some point filed a notice of *lis*

*pendens* with respect to the property in question. The trial court denied the appellants' motion to release the notice of *lis pendens*. Appellants urge that it is an abuse of discretion to refuse to release a notice of *lis pendens* when the party who filed the notice is seeking a constructive trust on the property solely for the purpose of satisfying a judgment against a defendant. They rely on the case of *Flores v. Haberman*, 915 S.W.2d 477, 478 (Tex.1995).

In *Flores*, the Texas Supreme Court was confronted with a suit for conversion in which the plaintiffs sought to impose a constructive trust on the property. *Id.* While the suit was pending, the plaintiffs filed a *lis pendens* on the property. *Id.* The court, noting that Texas Property Code Section 12.007(a) only authorizes the filing of a *lis pendens* during the pendency of an action involving title to real property, the establishment of an interest in real property, or the enforcement of an encumbrance against real property, held the notice was improper in that case where the plaintiffs sought the constructive trust in the property only to satisfy the judgment they sought. *Id.* We find *Flores* distinguishable. In this case, even if the trial court erred in denying the appellants' motion to remove the *lis pendens*, the trial court subsequently awarded Vaglica a constructive trust on the property and approved the filing of the judgment in the deed records, the Uniform Commercial Code Records, and the records of the Secretary of State. Appellants do not complain of the trial court's authorization of such filings and present no authority that such authorization is improper, nor are we aware of any. We consider, then, that the issue of the trial court's denial of appellants' motion to release the *lis pendens* is moot and that, even if it is not moot and in error, it is not such an error as probably caused the rendition of an improper judgment or that probably prevented appellants from properly presenting their case to this court. *See* TEX.R.APP.P. 44.1(a). We overrule point of error nine.

The trial court's judgment is AFFIRMED.

JOHN HILL, Justice (Assigned), dissenting.

I respectfully dissent because there is no evidence that the condition precedent to the memorandum of agreement has been met, and there is no evidence to support Vaglica's claim of fraud. The majority's determination that the condition precedent to the memorandum of agreement has been met is based upon an assumption of a loss on the MT. WASHINGTON job in the amount of $408,216, despite Vaglica's testimony that the amount of loss was $700,-000. Vaglica did not rely on the exhibits cited by the majority to urge that the loss was only $408,716; he conceded at trial and in this appeal that the loss was $700,-000. Rather than relying on the exhibits cited by the majority, Vaglica refers us to a recovery of $409,000 from the retainer on the job. The difficulty with that argument is that Vaglica testified at trial that the retainer had been received and that "as we stand here today" the MT. WASHINGTON contract had a loss of $700,000. If Vaglica's own figure for the loss is substituted for the figure used by the majority, the condition precedent was not met because there was not a profit of $300,000 on the two jobs. I would sustain point of error one.

I would sustain point of error four because there is no evidence that Sipco and Brock did not perform as promised under the memorandum of agreement. The majority's conclusion to the contrary is based upon its finding that there was sufficient evidence that they did not perform as promised.

I would sustain point of error five because there is no evidence that Brock or Sipco lacked the intent to perform when they entered into the agreement. By the terms of the agreement, neither Brock nor Sipco had any obligation to sell the property in question to Vaglica; the property at

that time was owned by BET, Sipco's parent company. Neither Vaglica nor the majority has shown how fraud could be established for lacking an intent to perform an obligation under an agreement that one has no obligation to perform.

Finally, I would sustain point of error six because, in the absence of evidence to support Vaglica's claim of fraud, there is no basis for exemplary damages. The majority overrules this point of error based upon its finding that there was evidence of fraud. I would reform the judgment to reflect that Plaintiff have and recover only damages in the amount of $72,851.50 against Defendant Century Marine, consisting of $60,000 in actual damages, and the balance as pre-judgment interest on that amount of damages from April 10, 1994, to the date of the trial court's judgment, and to reflect that Plaintiff take nothing as to Brock or Sipco, with costs of court charged ⅓ to Century Marine and ⅔ to Plaintiff. I would affirm all portions of the judgment as reformed, except that I would remand the issue of reasonable attorney's fees to the trial court for its determination.