John Thomas EBERLE, Maria Antoinetta Eberle, Martha Patty Eberle, and Mark A. Veit, Appellants,

v.

Norman David ADAMS, Appellee.

No. 01–99–01010–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Nov. 30, 2001.

Rehearing Overruled May 10, 2002.

William Lane Hubbard, Hodge, James & Hernandez, L.L.P., Harlingen, Shawn Casey, Shawn Casey & Associates, Houston, for appellant.

Robert Hoffman, Fulbright & Jaaworski, Houston, for appellee.

Panel consists of Justices MIRABAL, HEDGES, and SMITH.*

## OPINION

MARGARET GARNER MIRABAL, Justice.

This case involves the abduction of four-year-old Joshua Adams by his mother Kristie Adams (Kristie). Joshua's father, appellee, Norman David Adams (David), obtained a judgment based on an adverse jury verdict against Kristie's parents, her sister, and her former boyfriend for interfering with his possessory rights by aiding or assisting Kristie in the abduction. On appeal, we must determine if legally and factually sufficient evidence exists to uphold the jury verdict. We affirm in part; we reverse and render in part.

## CASE OVERVIEW

When Kristie and David filed for divorce in 1992, a bitter dispute ensued regarding

---

* The Honorable Jackson B. Smith, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

custody of their only child, Joshua. In August 1995, following a five-day trial, a jury awarded David the sole managing conservatorship of Joshua; Kristie was appointed the possessory conservator.

The trial court signed the divorce decree on December 13, 1995. The decree specified that Kristie was allowed visitation with Joshua from December 26, 1995 to January 1, 1996. On December 26, 1995, Kristie's mother and sister picked up Joshua at David's house. The Eberle family—including Kristie's father, mother, sister, and boyfriend—then spent the day together at Kristie's Houston apartment.

Kristie's parents returned to their home in the Harlingen area the following day. On December 28, Kristie drove to her parents' home with Joshua. In the early morning of December 29, Kristie left her parents' house with Joshua. Kristie allegedly told her parents she was driving to San Antonio to visit friends.

On January 1, 1996, Kristie did not return Joshua to David as scheduled. David launched an extensive and unsuccessful search for Joshua, including contacting law enforcement officials, hiring private investigators, and contacting numerous media sources. Despite these efforts, Kristie and Joshua were never found and remained missing at the time of trial.

In 1997, David filed suit against the following people for interference with his custody rights to Joshua: (1) Mark A. Veit (Veit—Kristie's former boyfriend); (2) Maria Antoinetta Eberle (Maria—Kristie's mother); (3) John Thomas Eberle (John—Kristie's father); (4) Martha Patty Eberle (Patty—Kristie's sister); and (5) Jason Eberle (Jason—Kristie's brother).[1] Specifically, David asserted the following three causes of action against each defendant: (1) aiding or assisting in the intentional interference with his possessory right to Joshua, a statutory tort available under Texas Family Code section 42.003, (2) intentional infliction of emotional distress, and (3) civil conspiracy.

Following a one-week trial in June 1999, the jury found four of the five defendants—Maria, John, Patty, and Veit—liable on all three claims; the jury also found they acted with malice. The jury completely exonerated Jason. The trial court entered a joint and several liability judgment in favor of David for $1,370,339.53 in actual damages, including interest. Additionally, punitive damages were assessed against the liable defendants.

Veit filed an individual brief, raising six issues; Maria, John, and Patty (collectively "the Eberles") filed a combined brief, also raising six issues. In the 12 total issues, some of which overlap, appellants challenge the legal and factual sufficiency of the evidence, complain that the trial court improperly excluded letters written by David from evidence, and assert the punitive damages awarded were improper.

## DISCUSSION

### A. Sufficiency of the Evidence

In Veit's issues one through three, he challenges the legal and factual sufficiency of the evidence as to each cause of action; in issue five he challenges whether the evidence shows a causal nexus between his conduct and David's damages; and in issue four, he challenges the sufficiency of the evidence as to the malice finding. Likewise, in issues one through three, the Eberles challenge the legal and factual sufficiency of the evidence as to each cause

---

1. The pleadings show that David sued Kristie too; however, she was not named in the jury charge or the final judgment. The record indicates that Kristie may have been dismissed from the suit because she could not be served with process.

of action; in issue six, the Eberles challenge the malice finding.

### 1. STANDARD OF REVIEW

■ When, as here, the party without the burden of proof challenges the legal sufficiency of the evidence, we will sustain the challenge only if, considering the evidence and inferences in the light most favorable to the finding, there is not more than a scintilla of evidence supporting it. *See Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995); *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987). "More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.' " *Burroughs Wellcome,* 907 S.W.2d at 499 (quoting *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994)).

■ We will sustain a factual sufficiency challenge only if, after viewing all the evidence, the evidence is so weak or the verdict so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

■ Also, as we examine the evidence, we remain mindful that the jury is the sole judge of a witness's credibility and the weight to be given the testimony. *Leyva v. Pacheco,* 163 Tex. 638, 358 S.W.2d 547, 549 (1962). The jury may believe one witness and disbelieve another and resolve inconsistencies in any testimony. *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986). This Court cannot substitute its opinion for that of the trier of fact and determine that it would have weighted the evidence differently or reached a different conclusion. *Hollander v. Capon,* 853 S.W.2d 723, 726 (Tex.App.— Houston [1st Dist.] 1993, writ denied).

### 2. INTERFERENCE WITH POSSESSORY INTEREST

In Texas, tortious interference with possessory interest is a statutory tort. *See* TEX. FAM.CODE ANN. §§ 42.001–.009 (Vernon 1996 & Supp.2001). The statute provides for liability, as follows:

(a) A person who takes or retains possession of a child or who conceals the whereabouts of a child in violation of possessory right of another person may be liable for damages to that person.

(b) A possessory right is violated by the taking, retention, or concealment of a child at a time when another person is entitled to possession of or access to the child.

TEX. FAM.CODE ANN. § 42.002 (Vernon 1996). Additionally, the statute provides for liability for a person who aids or assists in the interference, as follows:

(a) A person who aids or assists in conduct for which a cause of action is authorized by this chapter is jointly and severally liable for damages.

(b) A person who was not a party to the suit in which an order was rendered providing for a possessory right is not liable unless the person at the time of the violation:

(1) had actual notice of the existence and contents of the order; or

(2) had reasonable cause to believe that the child was the subject of an order and that the person's actions were likely to violate the order.

*Id.* § 42.003 (Vernon 1996).

■ Thus, to establish liability for a non-abductor's interference in child custody, the plaintiff must prove that: (1) a person takes or retains possession of a child or conceals the whereabouts of a child in violation of a court order; (2) the defendant aids or assists in the conduct; and (3) the defendant had actual or con-

structive notice of the court order. *Id.* §§ 42.002, .003.

With regard to this statutory cause of action, the trial court charged the jury as follows:

Do you find that any of the defendants interfered with Norman David Adams' possessory rights to Joshua Adams? To interfere with possessory rights, the defendant:

(1) took or retained possession of Joshua Adams, or

(2) concealed the whereabouts of Joshua Adams, or

(3) aided or assisted another person in taking, retaining or concealing Joshua Adams

in knowing violation of Norman David Adams' court-ordered right of possession of or access to Joshua Adams, including conservatorship, custody, and visitation.

"Order" means a temporary or final order of a court of this state.

The Eberles and Veit contend that the evidence is legally and factually insufficient to support the jury's findings because there is no direct evidence showing that they aided or assisted Kristie in abducting Joshua. Rather, appellants argue that the jury's findings are based on mere suspicion and impermissible inferences derived from circumstantial evidence. Specifically, appellants contend the jury's findings are based on inferences made in contravention of the "equal inference rule" that mandates a jury may not reasonably infer an ultimate fact from meager circumstantial evidence which could give rise to any number of inferences.

Three cases assist us in determining the sufficiency of the evidence in this case. In *Lozano v. Lozano,* Deana Lozano sued her ex-husband's parents, Juan and Blanca Lozano, his brother, Alex, and his two sisters, Monica and Sandra, for interference with her possessory rights by aiding or assisting her ex-husband, Junior, in abducting their daughter, Bianca. 983 S.W.2d 787 (Tex.App.—Houston [14th Dist.] 1998), *rev'd,* 52 S.W.3d 141 (Tex.2001). The court of appeals held that there was legally insufficient evidence of either circumstance. *Id.* at 792.

The Texas Supreme Court reversed the court of appeals in a per curiam opinion, holding that there was some evidence that Blanca, Monica, and Alex aided or assisted Junior, but that there was no evidence that Sandra or Juan aided or assisted Junior. *Lozano v. Lozano,* 52 S.W.3d 141, 144 (Tex.2001). The evidence supporting this holding is detailed in three concurring and dissenting opinions, which reveal that four justices agreed that the evidence was legally sufficient to show Blanca, Monica, and Alex aided or assisted Junior; two of those justices would also have held the evidence was legally sufficient to show that Sandra also aided or assisted Junior; three justices thought the evidence was legally sufficient only as to Blanca; and all justices agreed that the evidence was legally insufficient as to Juan.[2]

The majority held there was legally sufficient evidence of aiding or assisting Junior from the following facts: (1) Junior did not own a car or have a steady job and was behind in his child-support payments; (2) Junior had never been able to support himself without assistance from his parents; (3) within five months of Junior's

---

2. Only seven justices participated in the opinion. Justice O'Neill was a member of the panel that decided *Lozano* while she was a justice on the Fourteenth Court of Appeals. Justice Gonzales, who participated in the original decision, resigned his office on December 25, 2000 and did not participate in the opinion on rehearing.

disappearance, Alex borrowed $3,000 on his credit card—more than half his earned income for the year; (4) in response to discovery, Monica and Alex asserted a Fifth Amendment privilege (as did Sandra and other family members); (5) Monica and Alex (and Sandra) refused to give names and addresses of relatives and friends in Mexico; and (6) Monica and Alex took down several of the thousands of posters showing pictures of Junior and Bianca. *Id.* at 167 (Baker, J., concurring, and dissenting).

■ Chief Justice Phillips, writing for a majority of the justices, discussed the equal inference rule and offered this clarification:

> Properly applied, the equal inference rule is but a species of the no evidence rule, emphasizing that when the circumstantial evidence is so slight that any plausible inference is purely a guess, it is in legal effect no evidence. But circumstantial evidence is not legally insufficient merely because more than one reasonable inference may be drawn from it. If circumstantial evidence will support more than one reasonable inference, it is for the jury to decide which is more reasonable, subject only to review by the trial court and the court of appeals to assure that such evidence is factually sufficient.
>
> Circumstantial evidence often requires a fact finder to choose among opposing reasonable inferences. . . . And this choice in turn may be influenced by the fact finder's views on credibility. Thus, a jury is entitled to consider the circumstantial evidence, weigh witnesses' credibility, and make reasonable inferences from the evidence it chooses to believe.

*Id.* at 148–49 (Phillips, C.J. concurring, and dissenting) (citations omitted). Thus, if circumstantial evidence will support more than one reasonable inference, it is for the trier of fact to decide which is more reasonable, subject only to a factual sufficiency review. *Id.* at 148.

In *A.H. Belo Corp. v. Corcoran,* the father of an abducted child sought to hold a television station, the station's corporate owner, and a news reporter liable under Chapter 42 of the Family Code. 52 S.W.3d 375 (Tex.App.—Houston [1st Dist.] 2001, pet. filed). The reporter had interviewed the abductor-mother, with the child present, at a clandestine location unknown to the reporter. *Id.* at 377. The interview was then aired by the defendant television station. *Id.* The father sued the three media defendants alleging that they knew the whereabouts of the child during her abduction and failed to tell the father, the court, or authorities her location. *Id.* at 377–78. The father also claimed that the media defendants had entered into a conspiracy with the mother to deprive the father of his possessory rights to the child. *Id.* at 378.

The media defendants filed a no-evidence motion for summary judgment contending there was no evidence of a Family Code violation. *Id.* In response, the father argued that the duty under the Family Code not to conceal the location of an abducted child equates to a duty to reveal the location of the child. *Id.* at 382. With regard to this argument, we wrote: "There is nothing in section 42.003 or the case law to indicate such an affirmative duty by all who have any knowledge of an abducted child's whereabouts." *Id.* We noted that in other cases discussing liability under the Chapter 42 of the Family Code, including *Lozano,* courts have consistently found sufficient evidence to uphold liability when the defendants had taken some *affirmative steps* in aiding the abductor. *Id.*

The father argued that the reporter took affirmative steps when he sought the meeting and met with the mother and the child. *Id.* We disagreed, concluding that by meeting with and interviewing the mother, the reporter did not in any way assist in the abduction, retention, or concealment of the child because the child's concealment was the same with or without the meeting and the interview. *Id.* Thus, there was no evidence to support the section 42.003 claim. *Id.* We reversed the trial court's denial of the media defendants' no-evidence motion for summary judgment and rendered judgment in their favor. *Id.* at 380.

The only case in which a failure to provide information was found to support a liability finding is *Weirich v. Weirich*, 833 S.W.2d 942 (Tex.1992). In *Weirich*, the abducted child's grandmother testified at a contempt hearing that she would notify the court and the plaintiff's attorneys if she knew the whereabouts of the children. *Id.* at 945. At trial, the evidence showed that the grandmother knew of the children's location but failed to inform the court or the mother's attorneys. *Id.* In holding there was legally sufficient evidence that the grandmother aided and assisted in concealing the whereabouts of the children, the supreme court stated: "By swearing in open court, [the grandmother] assumed an affirmative duty to notify [the mother's] attorneys or the court if she discovered the whereabouts of the children." *Id.*

Keeping the principles expressed in *Lozano, Corcoran,* and *Weirich* in mind, we examine whether legally and factually sufficient evidence exists to support the jury's verdict against each defendant.

### a. Maria Eberle (The Mother)

With regard to Maria, the following was shown at trial:

- Kristie had a very close relationship with Maria; the two shared secrets.
- Maria was aware that David had been awarded the custody of Joshua by the trial court.
- Maria was present when Kristie told her father, John, on December 26, 1995, that she was thinking about running away with Joshua.
- Kristie worked part-time as a waitress and had little money.
- Other than helping Kristie with legal fees during the divorce, it was uncommon for John and Maria to give Kristie money.
- Maria obtained a loan from her bank for $6,000.
- On the afternoon of December 27, 1995, Maria went to her bank and cashed a check for $6,000.
- Out of the $6,000, Maria gave Kristie $3,000 in cash on December 28, 1995—the day before Kristie abducted Joshua.
- Maria testified that the remaining $3,000 was placed in a safe-deposit box, although the loan for the $6,000 was accruing interest.
- When John and Maria had given Kristie money for legal fees relating to her divorce in the past, they gave her a check, not cash.
- When Kristie did not return Joshua, David called Maria on January 2, 1996. Maria stated in a hostile voice that she did not know where Kristie was, told David not to call back, and hung up on him.
- In the January 2 conversation, Maria did not tell David that Kristie had gone to San Antonio on the 28th or what type of car Kristie was driving.
- Although Maria claimed that she was worried that Kristie had been raped or murdered when Kristie did not call,

Maria waited until January 12, 1996 to file a missing persons report with the Hidalgo County Sheriff's Department.

● Maria paid Kristie's January rent.

● Maria endorsed and deposited Kristie's last paycheck for $150 in her own checking account.

● The first time that Maria went to Kristie's Houston apartment following Joshua's abduction was the at the end of January 1996. At that time, Maria, John, and Veit moved Kristie's belongings from the apartment. Neither David nor the authorities were notified that Kristie's things were being moved from her apartment.

● On February 28, 1996, an emergency hearing was held in the trial court that had issued the custody order. At that hearing, Maria testified that she did not know the license plate number of the car Kristie was driving when she disappeared; however, Maria had provided the license plate number to the Hidalgo County Sheriff's Department in the missing person's report Maria filed on January 12, 1996.

● On February 28, 1996, Maria paid a $150 traffic ticket that Kristie had received. Maria testified she was fearful that Kristie would be stopped by the authorities and brought back to Houston because of the unpaid ticket.

● In spring 1997, the car that Kristie was driving at the time she and Joshua disappeared was found at the McAllen airport. The car belonged to Veit's car leasing company. Maria and Veit went to pick up the car when it was found. Maria did not contact the authorities or David to report the car had been located.

● Other than filing the missing persons report, Maria has made no effort to locate Kristie or Joshua.

David argues Maria's failure to provide useful information to either him or the authorities relating to Kristie and Joshua is sufficient evidence to support the jury's finding. For example, David argues that Maria (and the other defendants) knew Kristie planned to abduct Joshua, but failed to warn David. Maria also failed to notify David or the authorities before removing Kristie's belongings from her apartment. David asserts the apartment may have contained clues regarding Kristie's location. Similarly, David contends Maria aided or assisted Kristie in the abduction by failing to notify him or the authorities that the car Kristie had been driving when she disappeared with Joshua was found at the McAllen airport. The evidence showed that Veit eventually sold the car without David or the authorities being notified. David argues that the car may have contained clues that could have led to Kristie and Joshua.

We are not convinced that such evidence alone is legally sufficient to support the jury's finding of liability. As discussed in *Corcoran*, courts discussing liability under Chapter 42 of the Family Code, and its predecessor Chapter 36, have found evidence to be sufficient to support a jury's liability finding when the defendant had taken some *affirmative* steps to aid or assist the abductor in abducting or concealing the child. *See Corcoran*, 52 S.W.3d at 382.

Here, no evidence was presented that Maria assumed an affirmative duty to inform David or the authorities that: (1) Kristie mentioned leaving with Joshua; (2) the family planned to move Kristie's belongings from her apartment; and (3) the car Kristie was driving when she abducted Joshua had been found. Under these circumstances alone, it would not be reasonable for the jury to infer that by failing to provide such information to David or the

authorities, Maria aided or assisted Kristie in abducting or concealing Joshua.

■ However, there was evidence presented in this case that is analogous to that found to be sufficient in *Weirich.* The evidence showed that, at the time of the emergency hearing on February 28, 1996, Maria knew the license plate number of the car that Kristie was driving when she abducted Joshua. At trial, Maria admitted that when she stated that she did not know the license plate number at the hearing, she was not making a true statement. Because Maria had a duty to respond truthfully to the questions posed to her at the emergency hearing, her failure to respond is tantamount to an affirmative step to assist Kristie in abducting or concealing Joshua. The jury could have reasonably inferred that Maria hindered finding Kristie and by doing so, assisted her in abducting Joshua by failing to tell the trial court that information.

David also argues the evidence is sufficient to show Maria financially aided or assisted Kristie in abducting Joshua. The evidence showed Kristie was a part-time waitress with little income at the time of abduction. Maria testified she gave $3,000 in cash to Kristie to pay for legal fees associated with Kristie's appeal of the divorce and custody decree. However, the evidence shows that Maria had never given Kristie cash to pay for attorney's fees in the past; she had always written a check. Maria also denied she heard Kristie state she was considering fleeing with Joshua; however, John testified that Maria was present when Kristie made the statement. From this evidence, the jury could have found that Maria provided the $3,000 in cash to aid and assist Kristie in abducting Joshua.

The jury could have also believed that, by paying Kristie's traffic ticket, Maria aided or assisted Kristie in concealing Joshua. As Maria testified, if Kristie had been stopped with an outstanding traffic ticket, she may have been brought back to Houston. By paying the ticket, Maria insured this would not happen.

We also note that the evidence relating to the financial assistance that Maria provided Kristie, and Maria's payment of the traffic ticket, should be viewed in the context of the other circumstantial evidence in the record. For example, Maria's failure to make any efforts to locate Kristie or assist David in finding her lends further support to the reasonableness of the jury's inference that Maria aided or assisted Kristie in the abduction. *See Felker v. Petrolon, Inc.,* 929 S.W.2d 460, 464 (Tex. App.—Houston [1st Dist.] 1996, writ denied) ("In reviewing circumstantial evidence, we must look at the *totality* of the known circumstances rather than reviewing each piece of evidence in isolation") (emphasis in original).

Applying the appropriate standards, we hold that the evidence is legally and factually sufficient to support the jury's finding with regard to Maria.

### b. John Eberle (The Father)

With regard to John, the evidence at trial showed as follows:

- John and Kristie had a close relationship.
- John was aware that David had been awarded custody of Joshua by court order.
- John and Kristie had many conversations about her running away with Joshua.
- While at Kristie's apartment on December 26, 1995, Kristie told John that she was considering leaving with Joshua.
- At a hearing held on February 28, 1996, John testified that on the morn-

ing Kristie disappeared with Joshua, Kristie told John she planned to take Joshua and leave.

- John and Kristie prayed about her leaving with Joshua.
- In her deposition, Maria testified that John knew that she gave Kristie the $3,000. She testified that John accompanied her to the bank to withdraw $6,000 from their checking account. Maria stated: "Yes sir, the money that I borrowed for Kristie, we talked to [John]. Both of us went to the bank and asked for the money...."
- John and Maria are married and had a joint checking account.
- John took no steps to locate Kristie and Joshua, his daughter and grandson.

At the time of the abduction, John was aware that Kristie planned to run away with Joshua. At trial, both John and Maria testified, contrary to Maria's deposition, that John did not accompany Maria to the bank to withdraw the money. They also testified John was unaware Maria had given Kristie $3,000 in cash.

 As factfinder, the jury may believe or disbelieve any or all of the testimony of any witness. *See Toles v. Toles,* 45 S.W.3d 252, 259 (Tex.App.—Dallas 2001, pet. denied); *see also McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986) (stating factfinder may choose to believe one witness and disbelieve others when presented with conflicting evidence). The jury could have chosen to believe that John went with Maria to the bank to withdraw the money and that he knew Maria gave the $3,000 to Kristie. It is undisputed that John and Maria are married and had a joint checking account. From this evidence, the jury could have reasonably inferred that Maria *and* John gave Kristie the $3,000, which aided or assisted Kristie in her abduction of Joshua.

Viewing the evidence as we must, we hold that the evidence was legally and factually sufficient to support the jury's finding regarding John.

### c. Patty Eberle

With regard to Patty, the evidence showed in December 1995 Patty lived in Dallas, but was at Kristie's apartment to celebrate Christmas with the family on December 26. Patty and Maria picked up Joshua from David's house on the 26th, and then brought him to Kristie's apartment; Patty and Maria were the last people that David saw with Joshua.

David contends that Patty's own testimony supports the jury's verdict. Patty testified to the following:

- Patty was aware that David had been awarded custody of Joshua by court order.
- On December 27, 1995, Patty left for a vacation to California.
- Patty considered her mother to be her best friend.
- When Patty called John and Maria from California, they did not tell her Kristie had gone to San Antonio, Kristie was missing, or they feared that she had been raped or murdered.
- Patty also spoke to Maria on January 7, 1996; Maria gave her no reason to be alarmed about Kristie.
- Patty spoke to John and Maria once more on January 14, 1996. Patty's parents again did not mention that Kristie and Joshua were missing.
- Although Patty spoke to her parents throughout January, Patty testified she was leaving messages on Kristie's answering machine in an attempt to reach Kristie the weeks of January 8th and 15th.

- Patty claims that she did not know Kristie was missing until January 19 or 20, 1996.
- Patty took no steps to locate Kristie and Joshua, her sister and nephew.

David suggests much of Patty's testimony is not credible because it is unlikely that she did not know Kristie and Joshua were missing. David points out that, not only is it unlikely that Patty's parents would not tell her that Kristie was missing, Patty's testimony was also contradicted by Veit, who testified that Patty sent him a key to Kristie's apartment and mailbox in mid-January 1996.

David's argument appears to be as follows: because Patty lied about not knowing Kristie and Joshua were missing, she must also be lying about assisting Kristie in abducting Joshua. We do not agree with this logic.

Though Patty's possible lack of veracity may cast doubt on her credibility, it is not a substitute for evidence. If the jury chose to disbelieve Patty's testimony regarding whether she knew Kristie had disappeared, the only reasonable inference the jury could draw from this is that Patty did in fact know Kristie was missing in early January 1996. However, this evidence would not support an inference that she aided or assisted Kristie in the abduction.

 With regard to Patty, the record also shows: (1) she may have been present when the family prayed together about Kristie running away with Joshua; (2) she may have heard Kristie state that she was running away with Joshua; and (3) she made no effort to locate Kristie. When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of the fact's existence, the evidence is no more than a scintilla and, in legal effect, is no

evidence. *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). Here, the evidence relied on by David does no more than raise a suspicion that Patty was involved in Joshua's abduction.

The record also reveals that Patty failed to respond to David's request for production of documents, for which the trial court sanctioned her. However, no evidence was presented that Patty's failure to respond to the discovery request aided or assisted Kristie in concealing Joshua.

Because there is no evidence that Patty aided or assisted Kristie in abducting or concealing Joshua, the evidence is legally insufficient to support the jury's verdict as to the claim of tortious interference of David's possessory rights by Patty.

Based on the foregoing, we overrule the Eberles' issue one as to Maria and John; we sustain issue one as to Patty.

#### d. Mark Veit

In his issue one, Veit contends that the evidence is legally and factually insufficient to support the jury's finding that he interfered with David's possessory interest. In issue five, Veit asserts that because the evidence fails to show a causal link between his conduct and Joshua's abduction, the jury could not award damages against him.

With regard to Veit, the record reveals:

- Veit and Kristie had, at one point, a romantic relationship and had been engaged to be married.
- Veit maintained a close relationship with the Eberles and considered them to be like his own family.
- Kristie had told Veit that she was considering leaving with Joshua.
- Veit spent between $10,000 and $20,000 paying for Kristie's attorney's

fees relating to her divorce from David.

- Veit assisted Kristie in the appeal of the custody award. Veit continued the appeal even after Kristie disappeared.
- Veit was at Kristie's apartment on December 26, 1995, for the family's Christmas celebration.
- In October or November 1995, Veit loaned Kristie a 1990 Mustang; this was the car Kristie drove when she abducted Joshua.
- The 1990 Mustang belonged to Veit's auto leasing business. At the time Kristie abducted Joshua, the car had handicapped license plates and was registered to Gwenevie Saucedo, its previous owner.
- Veit went to David's house unannounced at the last weekend of January 1996 and told David that David could "stop this" if he wanted. David also asked Veit at that time if he knew anything about Kristie, but Veit refused to give David any information.
- Veit was present when John and Maria moved Kristie's belongings from her apartment at the end of January 1996.
- On January 18, 1996, David subpoenaed Veit to appear at a deposition to obtain information about Kristie. However, Veit did not appear at the deposition. Veit stated that he did not comply with the subpoena because his name was spelled "V–I–E–T" rather than "V–E–I–T." The trial court sanctioned Veit for failing to appear at the deposition.
- In spring 1997, Maria and Veit went to pick up the Mustang when it was found at the McAllen airport. Veit eventually sold the Mustang without contacting the authorities or David to tell them the car had been located.

- Veit took no steps to locate Kristie following her disappearance.

Mark contends Veit aided or assisted Kristie in abducting Joshua by lending Kristie the 1990 Mustang, which she used to abduct Joshua. However, the evidence showed Veit loaned Kristie the vehicle in October or November 1995, a month to two months before the abduction. The evidence also showed that the car Kristie had been driving before Veit loaned her the Mustang belonged to David's parents. Under the terms of the divorce decree, Kristie was required to give up possession of that vehicle on November 8, 1995. In light of the evidence that Kristie was required to return the car she was driving to David's parents by November 8, 1995, it would not have been reasonable for the jury to infer from the evidence that Veit gave Kristie the car to aid or assist in abducting Joshua.

 As with the other defendants, David contends that Veit assisted Kristie in the abduction by failing to provide either David or the authorities with information. As discussed above, failure to voluntarily provide information that a party is not otherwise obligated to provide does not in and of itself constitute evidence supporting a finding that the party aided or assisted the abductor. As such, the evidence showing that Veit voluntarily failed to notify David and the authorities that (1) Kristie was considering running away with Joshua; (2) the family moved Kristie's belongings from her apartment; (3) Veit had information about the car Kristie was driving; or (4) the Mustang had been located at the McAllen airport, is not alone evidence that supports the jury's finding that Veit aided or assisted Kristie in abducting or concealing Joshua.

 In contrast, however, Veit had an obligation to appear at the deposition David noticed on January 18, 1996 to pro-

vide any information he had about Kristie. The only excuse provided by Veit for failing to appear at the deposition was that his name was spelled "V–I–E–T" rather than "V–E–I–T" on the subpoena. The trial court obviously did not consider this excuse plausible and sanctioned Veit for his failure to appear. If Veit had appeared at the deposition, which took place less than a month after the abduction, he possibly could have provided detailed information regarding the car Kristie was driving, which may have led the authorities to Kristie. Veit offered no evidence to refute that he had been served the subpoena to appear at the deposition, and that if he had appeared, he could have provided information that may have led to Kristie and Joshua. Thus, the jury could have reasonably inferred that, by purposefully failing to appear at the deposition, Veit aided or assisted Kristie in Joshua's abduction. This inference is especially strong when read in conjunction with the evidence of Veit's failure to voluntarily provide information, his failure to take any steps to locate Kristie or Joshua, and his statement to David that David could "stop this" if he wanted.

Applying the appropriate standards, we hold the evidence was legally and factually sufficient to support the jury's finding against Veit.

■■■ However, our discussion does not end here. Veit correctly points out in his issue five that a plaintiff must produce evidence from which the jury may reasonably infer that the damages sought result from the conduct of the defendant. *Haynes & Boone v. Bowser Bouldin, Ltd.,* 896 S.W.2d 179, 181 (Tex.1995). In the charge, the jury was asked to answer the following question: "What amount of damages, if any, do you find were [*sic*] caused as a result of the interference with the possessory rights of David Norman Adams?"

We find, for the reasons discussed above, that the jury could have reasonably inferred a causal nexus between Veit's failure to appear at the deposition and David's damages.

We overrule Veit's issues one and five.

### 3. CIVIL CONSPIRACY

#### a. Civil Conspiracy, in General

■■■ A civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose. The elements of civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex.1983). Here, the unlawful acts are the tortious interference and the intentional infliction of emotional distress.

#### b. The Jury Charge

With regard to conspiracy, the trial court charged the jury as follows:

Were any of the defendants part of a conspiracy that damaged Norman David Adams?

To be part of a conspiracy, any one of the defendants and another person or persons must have knowledge of, agreed to, and intended an unlawful common objective or course of action that resulted in the damages to Norman David Adams. One or more persons involved in the conspiracy must have performed some act or acts to further the conspiracy.

"Unlawful" means violation of either criminal or civil law.

The jury answered "yes" for Maria, John, Patty, and Veit.

### c. Analysis

David introduced the telephone records for the parties into evidence. The records showed that many telephone calls were made between John and Maria's telephone number and Veit's number in the month following the abduction. This includes a 37–minute telephone conversation made from John and Maria's number to Veit's number on December 30, 1995—two days after Kristie left with Joshua. Maria and Veit then spoke on the telephone twice on January 2. The telephone records show numerous other calls made between John and Maria's number and Veit's throughout January 1996. The evidence also shows that, in the month preceding Kristie's and Joshua's disappearance, no telephone calls had taken place between Veit and the Eberles. Though the evidence of the telephone calls by themselves would not be sufficient evidence to support the jury's finding of conspiracy, this evidence should be viewed in conjunction with the other evidence presented at trial.

■■■ Maria testified that she and Veit discussed Kristie's traffic ticket. Maria stated she paid it after talking to Veit because they both feared that Kristie would be brought back to Houston if Kristie were stopped for the ticket. Viewing the evidence under the appropriate standards, we hold that such evidence is legally and factually sufficient to support the jury's finding on the conspiracy claim relating to Veit and Maria.

■■■ The same evidence that supports the jury's finding that John tortiously interfered with David's possessory rights also supports the jury's finding against John regarding the conspiracy claim.

Specifically, the evidence that John and Maria went to the bank together to withdraw the cash given to Kristie the day before she abducted Joshua is legally and factually sufficient to support the jury's finding of conspiracy against John.

■■■ With regard to Patty, the only evidence in the record relevant to conspiracy is that Patty spoke on the telephone to both her parents and Veit following the abduction. However, without more, this does not constitute legally sufficient evidence to support the jury's finding of conspiracy.

We overrule the Eberles' issue two as to Maria and John; we sustain it as to Patty. We overrule Veit's issue three.

### 4. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Appellants assert that David has not properly stated or proven a claim for "intentional infliction of emotional distress." David responds that the same evidence delineated above supports the jury findings under this claim.[3]

The jury awarded David $1,000,000 in mental anguish damages for each of the following three torts: interference with possessory interest, conspiracy, and intentional infliction of emotional distress. The actual damages for mental anguish awarded by the trial court in this case was $1,000,000. Thus, the amount of actual damages in the judgment is supported by the amount awarded by the jury *for any one* of these three torts. We deem it unnecessary to address the attack on the jury findings on intentional infliction of emotional distress in light of the fact the mental anguish damage award is supported by the other jury findings.

---

**3.** We note that because the evidence delineated above does not support the jury's findings as to Patty with regard to the torts already discussed, the evidence also does not support the jury's findings as to Patty with regard to the claim of intentional infliction of emotional distress.

Accordingly, we decline to reach the merits of Veit's issue two, and the Eberles' issue three.

### 5. MALICE

Appellants also assert there is no evidence or, alternatively, factually insufficient evidence to establish malice.

The statutory interference tort provides for exemplary damages when malice is present, as follows: "A person liable for damages who acted with malice or with an intent to cause harm to the plaintiff may be liable for exemplary damages." TEX. FAM.CODE ANN. § 42.006(b) (Vernon 1996).

With regard to malice, the jury was asked: "Do you find by clear and convincing evidence that the harm to Norman David Adams resulted from malice?"[4] The jury found that Maria, John, Patty, and Veit had acted with malice.

The jury was provided the following definition of "malice" based on Texas Civil Practice and Remedies Code section 41.001(7):

> "Malice" means:
>
> (A) a specific intent by any of the defendants to cause substantial injury to Norman David Adams; or
>
> (B) an act or omission by any of the defendants,
>
> (i) which when viewed objectively from the standpoint of any defendants at the time of its occurrence involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
>
> (ii) of which any of the defendants had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference

to the rights, safety, or welfare of others.

TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(7)(B) (Vernon 1997).

■■ As shown above, the definition of malice, like its common law ancestor "gross negligence," consists of two prongs: Part one describes what Texas courts refer to as the objective prong, and part two defines the subjective prong. *Id.; see also Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 325–26 (Tex.1993) (discussing gross negligence). Malice involves more culpable conduct than ordinary negligence with respect to both elements. *Alexander,* 868 S.W.2d at 326. Objectively, the defendant's conduct must involve an extreme risk of harm, a threshold significantly higher than the objective reasonable person test for negligence. *Id.* Subjectively, the defendant must have actual awareness of the extreme risk created by the conduct. *See Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 22 (Tex.1994).

■■ For a finding of malice to be sustained on appeal, legally sufficient evidence "must show **both** that the act was likely to result in serious harm **and** that the defendant was **consciously indifferent** to the risk of harm." *Id.* (emphasis in original); *see also Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 921 (Tex.1998).

The evidence showed the Eberles and Veit had quite a bit of animosity toward David. It is also clear from the record that Kristie and her family, as well as Veit, were upset that David was appointed sole managing conservator of Joshua.

In addition, as discussed above, the evidence showed, although John and Maria were aware Kristie planned to abduct Joshua, they gave her $3,000 in cash the

---

**4.** The jury was instructed: " 'Clear and convincing evidence' means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established."

day before the abduction. The evidence also showed, although he had been subpoenaed, Veit chose not to appear at the deposition noticed by David shortly after Kristie's disappearance, despite the fact he had information about the car Kristie was driving that could have been useful in finding her and Joshua.

■ Viewing the evidence as we must, we hold that the evidence was legally and factually sufficient to support the jury's malice finding as to Maria, John, and Veit. We further hold, because the evidence of the discussed underlying torts was legally insufficient to support the jury's findings against Patty, the evidence is also legally insufficient to support the malice finding with regard to Patty.

We overrule the Eberles' issue six as to Maria and John and Veit's issue four; we sustain issue six as to Patty.

## B. Punitive Damages

In issue five, the Eberles contend David should not have been awarded punitive damages because there is no or factually insufficient evidence of an independent tort to justify an award of punitive damages.

■ Recovery of punitive damages requires a finding of an independent tort with accompanying actual damages. *Schlueter v. Schlueter,* 975 S.W.2d 584, 589 (Tex.1998); *Fed. Express Corp. v. Dutschmann,* 846 S.W.2d 282, 284 (Tex.1993). Because we have held the evidence was legally and factually sufficient to support the jury's liability findings against Maria and John for tortious interference with David's possessory interest and conspiracy, we hold that punitive damages were recoverable against those defendants. However, because we have held that the evidence was legally insufficient to support

any of the jury's findings for these underlying torts against Patty, we hold that punitive damages were not recoverable against her.[5]

We overrule the Eberles' issue five as to Maria and John; we sustain it as to Patty.

## C. The Excluded Letters

In Veit's issue six and the Eberles' issue four, appellants assert the trial court erred by excluding defense exhibits 1 through 17, and by not allowing appellants to cross-examine David about their content. The disputed exhibits are a series of letters that David wrote to a group of his friends in 1990 and 1991.

Veit asserts the letters should have been admitted for three reasons: (1) they show bias under Texas Rule of Evidence 613(b); (2) they show motive, presumably under Texas Rule of Evidence 404(b); and (3) they can be used as impeachment evidence because the conduct involved moral turpitude. The Eberles assert the letters should have been admitted for three other reasons: (1) they were admissible as character evidence under Texas Rule 404(b); (2) they were relevant to the case pursuant to Texas Rule of Evidence 401; and (3) the probative value was not outweighed by their prejudicial effect under Texas Rule of Evidence 403.

### 1. The Letters

The "newsletters" were directed to 15–20 of David's male friends, termed the "desperados club," comprised of a core of high school friends plus added friends. In these lengthy letters, David expressed his philosophies on human relations, politics, life, economics, international matters, and current events. He also spent an inordinate amount of time espousing his belief that men are superior to women in a

---

5. We note that Veit did not assert a separate issue attacking the punitive damages award.

tongue-in-cheek writing style. The letters are very reminiscent of a stereotypical locker room discussion by a high school boy—vulgar, crude, and very immature.

The letters are noteworthy. What makes them disturbing is not so much the content, but the fact they were written by a 28 to 29–year–old man, rather than a teenager. In short, although perhaps intended to be humorous, the letters reflect extreme immaturity, very poor judgment, and crude thinking—particularly in relation to females.

## 2. STANDARD OF REVIEW

 The admission or exclusion of evidence is a matter within the trial court's discretion. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995). To obtain reversal of a judgment based on error in the admission or exclusion of evidence, an appellant must show that the trial court's ruling was in error and that the error was calculated to cause and probably did cause "the rendition of an improper judgment." TEX.R.APP. P. 44.1(a)(1); *see also Alvarado,* 897 S.W.2d at 753–54.

## 3. THE TRIAL COURT'S RULING

The record indicates that the trial court initially determined to exclude the letters during a pre-trial hearing related to motions in limine; however, we have no reporter's record of that hearing. During their case-in-chief, appellants again sought to admit the letters. Outside the presence of the jury, the trial court heard strenuous arguments by appellants to admit the letters. The trial court determined they were inadmissible because they were not relevant and because they were prejudicial.

## 4. ANALYSIS

We first examine the relevance of the letters under Rule 401. As stated by the trial court during its determination to exclude the letters, the letters do provide insight into the traits of a parent—which is relevant for determining custody. However, custody was not at issue here; rather, custody was decided in the divorce trial.

 To be relevant here, the letters would need to relate to David's claims of tortious interference with possessory interest of a child, intentional infliction of emotional distress, or conspiracy, or the defendants' defenses to those claims. Although the letters may speak to appellants' motives in assisting with the abduction, or alternatively their motives in not assisting David in locating Kristie, appellants' motives are not a defense to these torts. *See* TEX. FAM.CODE ANN. § 42.007 (stating sole defense to statutory tort is that "the defendant acted in violation of the order with the express consent of the plaintiff").

Also, under the facts presented here, we are unpersuaded by appellants' arguments that the letters were appropriate for impeachment or rebuttal purposes. The trial court could have reasonably concluded that allowing these nine-year-old letters into evidence at the disputed intervals would have been unfairly prejudicial to the relevant issues.[6]

Having examined the entire record, we cannot say the trial court abused its discretion in excluding the letters. We overrule Veit's issue six and the Eberles' issue four.

## CONCLUSION

We affirm the trial court's judgment as to Maria, John, and Veit. With regard to

---

**6.** We note that the trial court allowed appellants reasonable and ample opportunities to cross-examine David.

Patty, we reverse the trial court's judgment and render judgment that David take nothing against her.