**Opinion issued August 20, 2020**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-19-00451-CV

———————————

**ELISSA ADAMS, Appellant**

**V.**

**ALLSTATE COUNTY MUTUAL INSURANCE, Appellee**

---

**On Appeal from the 190th District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-69348**

---

## MEMORANDUM OPINION

Following a motor vehicle accident with an underinsured motorist, Elissa Adams sued Allstate County Mutual Insurance ("Allstate") under an at-fault driver's underinsured motorist benefits policy. A jury awarded Adams a total of $85,787.37 for her past damages but awarded nothing for her future damages. Adams filed a

motion for new trial challenging the zero-dollar-future-damage award, and the trial court denied the motion and entered a final judgment on the jury's verdict. Adams then filed a motion for new trial on the final judgment, and the motion was overruled by operation of law. Adams appealed the trial court's order denying her motion for new trial on the final judgment.

We affirm.

## Background

### *Car Accident*

In January 2012, Adams was a passenger in a vehicle driven by J. Johnson as they were traveling from Midland to Lubbock. Another motorist, S. Montoya, attempted to pass Johnson's vehicle on the highway, lost control of the vehicle, and collided with Johnson's car. It is undisputed that Montoya caused the accident. Adams sustained a concussion and other injuries. Emergency responders transported Adams to a nearby hospital. The emergency room physician advised Adams to seek additional treatment for her injuries after examining her and providing her with emergency treatment.

### *Medical Treatment*

Adams experienced severe headaches after the accident. Adams sought treatment from Dr. David Braunreiter, a double board-certified physician in family medicine and sports medicine. Adams complained of "post-concussive symptoms"

from the accident, including "dizziness," "light sensitivity," "difficulty sleeping," "problems in concentration," "optical divergence,"[1] and inability to "exercise." Adams also complained about her headache and migraine symptoms.

Adams told Dr. Braunreiter that she had a prior history of headaches and that she had surgery around 2008 to help relieve them. She also told him that her post-accident headaches were "different than prior headaches that she . . . experienced." Dr. Braunreiter determined that her current headaches were caused by the motor vehicle accident. Dr. Braunreiter examined Adams and administered an MRI and other concussion-related diagnostic tests. He diagnosed Adams with a "closed head injury" (i.e., a concussion) along with other "post-concussive symptoms," including "attention disorders" and "anxiety/depression issues."

Dr. Braunreiter performed an occipital nerve block operation on Adams, prescribed her medication, and referred her to a neuro-optometrist for optical divergence testing. He also encouraged her to exercise lightly and increase her physical activity. Afterwards, Adams documented her recurring headaches in a log, listing the frequency, duration, and pain location of her headaches. Dr. Braunreiter saw Adams about 20 times between October 2013 through April 2016. Dr.

---

[1]     Dr. Braunreiter described an "optical divergence" as "the inability of your control of your eye movements to focus up close and far away." When explaining how this affected Adams, Dr. Braunreiter stated that it was difficult for Adams to see clearly when she brought an object closer to her face.

3

Braunreiter reported that Adams's cognitive impairment had improved but that she would require long-term treatment for her recurring headaches. He did not anticipate any resolution of her symptoms in the foreseeable future.

### *Jury Trial*

Later, Adams settled her claims against Montoya for her policy limits and then sued Allstate to recover past and future damages through Montoya's underinsured motorist benefits. At trial, Dr. Braunreiter testified as Adams's expert witness based on his review of her medical history and his personal observations of her. He testified about Adams's medical history, the tests he administered, the medications he prescribed, the reasons for referring her to other physicians, the follow-up treatments, the proximate cause of her recurring headache symptoms, and her need for future medical care. He opined that Adams's post-accident headaches were not a continuation of her pre-existing headache condition for three reasons. First, her headaches ceased years before the accident, indicating that the surgery performed by her childhood physician resolved the headache condition. Second, his personal observation of Adams revealed improvement of all her symptoms, except for the headaches, which evidenced signs of a new injury. Third, her complaint that the new headaches felt "different" than they felt years before the accident demonstrated that her post-accident headaches were unrelated to the pre-existing headaches; otherwise, they would have felt the same.

Allstate retained Dr. Leonard Hershkowitz to testify about his evaluation of Dr. Braunreiter's treatment and diagnosis of Adams. He did not personally evaluate or treat her. Dr. Hershkowitz was very critical of Dr. Braunreiter's medical conclusions. He disagreed that Adams's headaches were caused by the accident. He testified that Adams's family history of headaches, personal history of headaches, and diagnosed psychological issues might have contributed to the duration and severity of her post-accident headaches. He also testified that Dr. Braunreiter did not administer the appropriate diagnostic tests to properly identify the actual cause of Adams's headaches.

After hearing all the evidence, the jury deliberated and awarded Adams past damages totaling $85,787.37: $30,000 for physical pain and suffering, $30,000 for mental anguish, $20,787.37 for medical expenses, and $5,000 for physical impairment. The jury awarded Adams zero dollars for future damages, including future physical pain and suffering, mental anguish, medical expenses, and physical impairment. The trial court entered a final judgment on the jury's verdict.

### *Motion for New Trial*

Adams filed an "Amended Motion for Mistrial or in the Alternative, Motion for New Trial" contesting the zero-damage award. In the motion, Adams argued a new trial was warranted because the undisputed trial evidence showed that she was entitled to damages for future medical care.

5

To support her motion, Adams attached her own affidavit summarizing her trial testimony concerning her medical condition, medical care, and symptoms showing that the car accident caused her post-accident headaches. She also described the accommodations she received at school and at work due to the accident. In addition to her affidavit, Adams attached Dr. Braunreiter's deposition testimony and her medical records from his office showing that he anticipated future medical care, including about four visits per year with a physician, ongoing medications, and possible adjustments to her care as her symptoms changed. Dr. Braunreiter opined that the car accident proximately caused her injuries.

Adams also attached a clinical note from Dr. Pamela Blake, her former neurologist. Dr. Blake treated Adams for migraines when she was a child and evaluated her headache symptoms after the car accident. Dr. Blake opined that Adams's pre-existing headaches had resolved in 2009, about three years before the car accident. She described Adams's current headaches as "post-traumatic" based on the "worsening pain after the [motor vehicle accident]."

Additionally, Adams attached a report from Terry Arnold, a certified life care planner who prepared a cost analysis for Adams's future medical care. Based on the four annual treatment visits Dr. Braunreiter opined would be required and the annual costs of her medications over a 55-year life expectancy span, Arnold determined that lifetime total costs for Adams's future medical care was $241,466.50. Finally,

Adams attached Dr. Hershkowitz's deposition to show that Adams was not "malingering," that she sustained a "mild traumatic brain injury" that required future medical care, and that medications would be necessary to treat her medical issues. Adams initially asserted that Dr. Hershkowitz failed to controvert the medical conclusions of Dr. Braunreiter and Dr. Blake, but she later conceded that Dr. Hershkowitz's deposition testimony disputed some of their conclusions. Adams's motion contended, "While there may be some minor disagreements about which medications should be prescribed [or] which tests should be undertaken, there was no disagreement that she should at least have the opportunity to visit with her treating physician three to four times a year to deal with her ongoing symptoms."

Allstate responded to her motion and contended that its evidence demonstrated that Adams was not entitled to an award for future damages because there were other contributing factors unrelated to the accident that caused her recurring headaches. Allstate primarily relied on Dr. Hershowkitz's deposition testimony. Dr. Hershkowitz challenged Dr. Braunreiter's diagnosis and treatment of Adams. He also disputed the proximate cause of her symptoms and her need for future medical care. Dr. Hershkowitz stated that Adams needed future medical care to treat her pre-existing headaches not caused by the accident.

7

The trial court denied Adams's motion and entered a final judgment on the jury's verdict. Later, Adams filed a second motion for new trial on the final judgment, and the motion was overruled by operation of law. This appeal followed.

## Denial of Motion for New Trial

Adams's sole issue asks, "Was the jury's verdict against the great weight and preponderance of the evidence and did the trial court err by denying Adams'[s] motion for new trial?" The issue is whether the evidence is factually insufficient to support the jury's zero-damages finding that Adams was not entitled to an award for future damages for her headaches.

### A.     Standard of review

We review a trial court's denial of a motion for new trial for abuse of discretion. *In re R.R.*, 209 S.W.3d 112, 114 (Tex. 2006) (per curiam). Because Adams attacks the factual sufficiency of an adverse jury finding on which she had the burden of proof, she must demonstrate that the jury's adverse finding of zero damages is against the great weight and preponderance of the evidence. *See Jordan v. Sava, Inc.*, 222 S.W.3d 840, 853 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (op. on reh'g). In reviewing a claim that the jury verdict is against the great weight and preponderance of the evidence, we consider and weigh all of the evidence and may set aside the verdict only if the finding is "so contrary to the overwhelming

weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

The jury's findings must be accorded great deference. *McKnight v. Calvert*, 539 S.W.3d 447, 459 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). Jurors are the sole judges of the witnesses' credibility. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). The jury may believe or disbelieve the testimony of a witness, in whole or in part, and it may resolve inconsistencies in any testimony. *See Eberle v. Adams*, 73 S.W.3d 322, 327 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (citing *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986)). We may not substitute our opinion for that of the trier of fact. *Ulogo v. Villanueva*, 177 S.W.3d 496, 499 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

**B.    The trial court did not abuse its discretion by denying the motion for new trial based on factually sufficient evidence of zero-damages award**

Adams challenges the trial court's denial of her motion for new trial. Adams contends that the jury's verdict in awarding her no damages for future physical pain and suffering, mental anguish, medical expenses, and physical impairment was against the great weight and preponderance of the evidence because "Adams and Allstate's medical experts agreed that [she] required future medical care" and Adams showed that her prior episode of headaches had resolved before the accident.

Adams testified that her pre-accident headaches started when she was in the fifth grade. They resolved after she underwent two surgeries and completed her

9

treatment with Dr. Blake. She admitted that she continued having headaches, but Dr. Blake "addressed a specific kind of headache" that she was experiencing at that time. After the car accident, Adams experienced headaches on the left side of her head that spread to her entire head as the condition worsened. She kept a headache log detailing the headaches as she experienced them. Finally, she testified about how her current headaches impaired her daily life activities and decision-making abilities—problems that she did not have before the accident.

Further, Adams introduced into evidence a clinical note from Dr. Blake stating that she performed "occipital nerve decompression in 2007" followed by a "trigeminal branch decompression in 2008." Dr. Blake noted that Adams "was doing well with [a] good reduction in headaches" after the medical procedures. Dr. Blake's last visit with Adams was through her mother in January 2009, about three years before the car accident. When Dr. Blake examined Adams after the accident, she determined that the post-accident headaches Adams was experiencing were "post-traumatic," based on the "worsening pain after the [motor vehicle accident]."

Dr. Braunreiter testified about his diagnosis, treatment, and care of Adams. Specifically, he diagnosed Adams with a closed head injury and concluded that her post-accident headaches were proximately caused by the car accident. Dr. Braunreiter discussed how he determined, diagnosed, and treated concussions. He rejected the use of objective data (e.g., "a computerized or mini mental status

examination" or "a formal neuropsychological evaluation") to diagnose concussions. Instead, he concluded that "concussion assessments" are "really subjective" in nature by requiring physicians to piece "a big story together with a neurological examination, a cognitive assessment, and just listening to the story of what's going on [with the patient], [in addition to the patient's] symptoms that are being reported." Based on his medical expertise and observation of Adams, Dr. Braunreiter believed that Adams required future medical care, including up to four office visits yearly plus prescription medication.

Allstate asserts that Adams did not carry her burden of proving that her recurring headaches would continue in the future. Allstate argues that the evidence showed that Adams experienced chronic headaches prior to the car accident. Allstate also argues that the evidence failed to show that she required future damages for her headaches. For this reason, Allstate argues that the trial court did not abuse its discretion in denying Adams's motion because the jury's verdict awarding past but no future damages was not against the great weight and preponderance of the evidence.

Allstate noted inconsistencies in Adams's evidence. First, Allstate questioned Adams about the entries in her headache log. The evidence revealed that Adams's trial testimony about the description of her headaches conflicted with the entries in her headache log. At trial, Adams testified that her headaches were located on the

left side of her head starting at her "forehead" or "back of head" and spread all over as they progressively worsened. She later admitted that she did not document in her log that her headaches started on the left side of her head in a "cluster pattern" or that they worsened as they spread to her entire head.

Next, Allstate challenged the credibility of her symptoms. Adams testified that her pre-accident headaches "were never classified as migraines" and that she was not aware of any diagnosis of migraines. But Allstate presented evidence to the contrary showing that Adams had a postoperative diagnosis of a "variant of migraine headaches." Dr. Blake's clinical note confirmed this: "[Patient] stated that she had surgery several years ago for migraines, a nerve was being pinched by a muscle. Nerve was freed up and pain resolved."

The jury also heard testimony from Allstate's expert. Dr. Hershkowitz reviewed Dr. Braunreiter's evaluation of Adams and disagreed with Dr. Braunreiter's diagnosis of post-concussion syndrome. In fact, Dr. Hershkowitz did not see anything in Adams's medical records indicating that she had suffered a traumatic brain injury caused by the accident. Dr. Hershkowitz testified in great detail about the lack of neurological testing to determine the actual cause of Adams's post-accident headaches. Dr. Hershkowitz believed that Dr. Braunreiter improperly diagnosed Adams because he was not a board-certified neurologist who primarily treats patients with headaches. And because Dr. Braunreiter did not

12

specialize in neurology, Dr. Hershkowitz believed that he did not administer the appropriate tests to confirm or rule out post-concussion syndrome. He noted that Adams had not had "full sophisticated tests" and her medical records lacked "a neuro-ophthalmological evaluation or an ophthalmological evaluation by a medical doctor." He testified that Dr. Braunreiter's medical conclusions were premature due to the lack of testing. When asked about whether the appropriate testing had been done to rule out other potential causes of Adams's symptoms, Dr. Hershkowitz stated:

> The appropriate testing that I've talked about—neuropsychological, neuro-otologist, neuro-ophthalmological—those tests have not been done in order to attempt to explain because once you can explain at least the symptoms, then that's a starting point. Okay. Now we understand why she has them, where it's coming from. How do we help her? So, it's I would like to use the term "explain" rather than rule in ruling out. [sic]. Explain her symptoms to see if she can be helped.

Because he believed that Dr. Braunreiter incorrectly determined the true cause of Adams's symptoms, Dr. Hershkowitz opined that Dr. Braunreiter's treatment of Adams was ineffective because she continued to experience real symptoms more than five years after the injury. For instance, Dr. Hershkowitz criticized the medications Dr. Braunreiter prescribed to Adams because they had not reduced her symptoms. When asked why he was so critical of the medications prescribed to treat Adams, Dr. Hershkowitz acknowledged that Topamax was a medication used to treat headaches, but explained it was not an appropriate medicine for Adams because

13

she already had concentration problems and Topamax negatively affects cognitive functions:

> Well, they really haven't worked. He's tried a number of medications that also I—I would be critical of because the literature has shown that they don't have—they don't really work that well. These are not for headaches, I'm talking about. At one time—she's a kid who talked about concentration problems and he recommended Topiramate, called Topamax. We use that for epilepsy. We use that for migraine headaches, that's true. But here's the problem with that choice. One of the common side effects is cognitive problems. About 15 percent of the people who take Topamax for whatever reason, epilepsy or prevention of migraine headaches, it affects their cognitive function. So, why would you take somebody—why would you select that one for treatment of migraine prevention when you know that this kid is already talking about difficulty with concentration and you're going to put her on medication that has a high incidence of difficulty with concentration, cognitive. So, I have those kinds of disagreements with his choice of medicine and . . . Topamax would be a good one, but then you have to individualize. No, not for this kid.

Finally, in support of the jury's verdict, Allstate relied on Dr. Hershkowitz's opinion that future medical care was unnecessary because there were other contributing factors for Adams's post-accident headaches. He stated that Adams required future medical care for her pre-accident headaches, but her post-accident headaches were not "medically related" to the car accident. He opined that her headache history and pre-existing psychological issues gave him reason to believe that her other injuries had resolved and only her recurring headaches persisted. He attributed Adams's post-accident headaches to pre-existing psychological issues,

including moderate depression, psychomotor retardation, feelings of helplessness and paranoia, and signs of Attention Deficit Disorder, and thoughts of self-harm.

Based on the evidence adduced at trial, the jury's zero damages award for future medical expenses was not against the great weight and preponderance of the evidence. *See Huston*, 434 S.W.3d at 642; *see also Landacre v. Armstrong Bldg. Maint. Co.*, 725 S.W.2d 323, 325 (Tex. App.—Corpus Christi 1986, writ ref'd n.r.e.); *Platt v. Fregia*, 597 S.W.2d 495, 495–96 (Tex. Civ. App.—Beaumont 1980, writ ref'd n.r.e.). In general, the jury has "considerable discretion" in evaluating evidence. *See McGalliard*, 722 S.W.2d at 697. Damages related to matters of physical pain and suffering, mental anguish, and physical impairment are "necessarily speculative." *Lanier v. E. Foundations, Inc.*, 401 S.W.3d 445, 455 (Tex. App.—Dallas 2013, no pet.) (citing *Belford v. Walsh*, No. 14-09-00825-CV, 2011 WL 3447482, at *7 (Tex. App.—Houston [14th Dist.] Aug. 9, 2011, no pet.) (mem. op.)). "When there is conflicting evidence about the severity of the injuries or about whether the injuries were caused by the collision, the jury has the discretion to resolve the conflicts, determine which version of the evidence to accept, and refuse to award damages." *Lanier*, 401 S.W.3d at 455. "The jury may determine that only part of the injuries [was] caused by the defendant's conduct at issue and may award damages accordingly." *Huston v. United Parcel Serv., Inc.*, 434 S.W.3d 630, 641

(Tex. App.—Houston [1st Dist.] 2014, pet. denied). The jury did so here by awarding past damages but not future damages.

Because the jury heard conflicting evidence and decided to award past damages but not future damages for physical pain and suffering, mental anguish, medical expenses, and physical impairment, the jury could have reasonably believed Adams and Dr. Braunreiter's testimony that the accident caused her post-accident headaches, but their testimony did not adequately convince the jury that her recurrent headaches would continue into the future. The jury could have reasoned that Adams needed to undergo more neurological testing to establish causation for future damages. The jury could have also reasoned that Dr. Braunreiter's testimony about Adams's indefinite need for medical care was speculative due to Dr. Hershkowitz's testimony about the lack of neurological testing and ineffective treatment. *See Lanier*, 401 S.W.3d at 455. The jury can accept or reject any testimony, even expert testimony. *Eberle v. Adams*, 73 S.W.3d at 327; *McGalliard*, 722 S.W.2d at 697 (explaining that jurors may reject expert testimony and accept other evidence).

The jury declined to award future damages for this reason considering that it was not convinced that the evidence demonstrated a need for future damages. The jury's finding was not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain*, 709 S.W.2d at 176. We cannot say that the jury's verdict was against the great weight and preponderance of the evidence as to be

manifestly unjust, shock the conscience, or clearly demonstrate bias. The trial court

did not abuse its discretion by denying Adams's motion for new trial.

## Conclusion

We affirm the trial court's judgment.


Sarah Beth Landau
Justice

Panel consists of Justices Keyes, Kelly, and Landau.